UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:16-CR-9 (VAB) |
| | : | |
| v. | : | |
| | : | |
| HAROLD J. PICKERSTEIN | : | May 4, 2016 |

## GOVERNMENT'S SENTENCING MEMORANDUM

For decades, attorney Harold James Pickerstein was one of the most prominent members of the Connecticut bar.  Then, between 2011 and 2013, he embezzled over $600,000 from a trust fund held for one of his longtime clients, who was incarcerated at the time.  When the victim realized the money was missing, Pickerstein claimed it had gone to pay legal bills.  That was untrue.  Pickerstein spent the money on personal expenses, including about half to pay his state and federal taxes.  Only after the client returned home was he able to directly confront Pickerstein, who admitted taking the money for himself.  In a rapid succession of events, the victim alerted Pickerstein's law firm, which promptly reimbursed the stolen funds; Pickerstein was forced to leave his firm; and he resigned his law license.  Now, after a career during which he prosecuted or defended countless criminal defendants, Pickerstein stands convicted of fraud and awaits sentencing himself.

The United States respectfully submits the following memorandum, to aid the Court in anticipation of the sentencing hearing scheduled for May 10, 2016.  For the reasons set forth below, the government asks that the Court adopt the findings of fact and the Sentencing Guideline calculations in the Pre-Sentence Report ("PSR"), and impose a sentence that adequately reflects both the nature of the offense and the individual characteristics of the offender.

## I.   Procedural History

Defendant Pickerstein appeared in the United States District Court at Bridgeport, Connecticut, before the Honorable Victor A. Bolden, United States District Judge, on January 14, 2016.  At that hearing, Pickerstein pled guilty to a one-count information in Case No. 3:16-CR-9 (VAB), which charged him with committing mail fraud in violation of Title 18, United States Code, Section 1341.  *See* Doc. #1.  Sentencing has been scheduled for May 10, 2016. With the consent of the Government, the defendant has remained on release without bond.

## II.   The Offense Conduct

In summary: Between August 2011 and October 2013, Pickerstein embezzled over $600,000 from a trust account held for his client, James Galante.  Pickerstein spent about half of the stolen funds to pay down his federal and state tax liabilities, and spent the rest on other personal expenses for himself and his family.  When Galante discovered the accounting discrepancy in November 2013, Pickerstein sent him an email and a letter, falsely representing that most of the missing funds had been spent to pay off Galante's legal invoices from Pickerstein's law firm.  A year later – after release from prison – Galante secretly recorded a conversation with Pickerstein, confronting him over the money.  Pickerstein admitted that he had used a "chunk" of the money for himself, and that he had in fact "written off" the legal bills.

The embezzled funds are related to an earlier case that was prosecuted in the U.S. District Court for the District of Connecticut, *United States v. James Galante*, No. 3:06-CR-161 (EBB).  Galante was prosecuted for charges relating to the illegal partitioning of the market for trash collection in southwestern Connecticut.  Pickerstein represented Galante's corporations in connection with the civil forfeiture aspects of the case, until he was disqualified from the case.

In 2008, Galante pled guilty and agreed to forfeit all of his interests in 25 trash-related

companies.  In order to satisfy loans from Galante and his wife to those companies, the Government agreed to reimburse Galante $10,750,000 after sale of those companies.  The companies were sold in 2010 and 2011.  Over about three years, the United States paid the obligation in various disbursements.   The United States sent the first disbursements, totaling $7,617,353.26, to a designated escrow trust account (the "Trust Account") under the control of Pickerstein, held at the financial services company Janney Montgomery Scott.  The Trust Account was created because Galante was involved in a separate lawsuit with his former business partner, Thomas Milo, with whom there was a dispute about the partition of those funds. The United States subsequently wired the remaining $3,132,646.74 in April 2014 to a separate designated account controlled by Galante.

While Galante was serving his prison term, Pickerstein embezzled approximately $600,000 from the Trust Account.  From August 2011 through October 2013, Pickerstein issued over forty checks from the Trust Account totaling $613,216.20.  Many checks from the Trust Account were made payable directly to "H. James Pickerstein," and he deposited them into his personal bank account.  He spent those funds on personal and family expenses, including taxes he owed to the federal and state governments.  Other checks from the Trust Account were made payable directly to the IRS and the Connecticut Commissioner of Revenue for his personal taxes, without passing through his personal bank account.  Three additional checks were made out directly to clothing shops in Fairfield, Connecticut, for a total of $8,228.25.  Of the total amount of embezzled funds, roughly 50% ($351,546.19) went to the IRS, and 13% ($80,941.76) went to the Connecticut Department of Revenue Services. The rest went to other personal and family expenses.  At no time did Pickerstein seek Galante's authorization to withdraw these funds from the Trust Account, nor (prior to detection of the fraud) did he inform Galante that he had done

so.

In late 2013, Galante was nearing release from federal prison. The litigation with his former business partner had been resolved, so he asked Pickerstein to release the escrowed funds. On November 24 and 25, 2013, Pickerstein caused four wire transfers to be sent to Galante's agent, totaling $6,583,304.37. On November 25, 2013, Galante sent an email to Pickerstein stating that there should be an additional balance of $734,048.89 plus accrued interest, and demanded to know when he would receive the balance of his funds. Later that same day, Pickerstein sent a reply email to Galante, falsely stating in part that he "had to settle three things," namely legal fees and expenses for various matters arising out of the *Galante* case.

On November 27, 2013, Pickerstein sent a more detailed reply in a letter on his law firm letterhead, which was sent by U.S. mail to Galante at the Federal Correctional Institute in Allenwood, Pennsylvania. Following up on the email sent two days earlier, Pickerstein claimed that the difference between the amount wired by the Government (plus interest), and the amount disbursed to Galante was attributable to specific deductions, including (among other things) $187,601, "representing the unpaid portion of our invoices in connection with our representation of AWD [Galante's companies] through and up to my disqualification," and $463,769.45 "representing the unpaid part of our bill in connection with the Milo litigation" involving Galante's former business partner.

Although Pickerstein claimed that these sums had been deducted to pay invoices for legal services from Pickerstein's law firm ("our invoices"), billing records obtained from that law firm confirm that the vast majority of those funds were never paid to the firm, for legal services bills or otherwise. Instead, as noted above, they were largely withdrawn directly by Pickerstein for his own personal use.

On August 20, 2014, after his release from prison – and before the matter came to the attention of law enforcement – Galante invited Pickerstein to his office, where they discussed the disputed funds for about 39 minutes.  Unbeknownst to Pickerstein, Galante was recording the conversation.  During that conversation, Galante confronted Pickerstein about the "$700,000 you took."  Pickerstein offered justifications for taking the money ("I was jammed up with my firm"; "I'm broke, [my son] hasn't worked; my wife's medicine is $3500 a month"), effectively admitted taking the money for personal expenses rather than legal bills ("I took a lot of the money myself and wrote off the bills [from the law firm]"; "The shit hit the fan with my family. I had nowhere to turn."  "Since they [the law firm] wasn't paying me, I wrote off the bills [issued by the law firm to Galante]"; "I took a chunk myself"); and begged Galante not to take up the matter with his law firm ("That will kill me as a lawyer"; "Don't ruin my career"; "They'd throw me out in a second and God knows what else they'll do to me; I'm broke").

On October 20, 2014, the law firm was contacted by Galante's attorneys, who disclosed the embezzlement and turned over a copy of the recorded conversation.  The law firm immediately forced Pickerstein to leave the firm, reported the matter to the Connecticut State Disciplinary Counsel, and reimbursed Galante for all of the stolen funds.  Pickerstein resigned his law license shortly thereafter.

III.    **Penalties**

A. **Statutory Penalties and Guideline Calculations**

The maximum penalty under 18 U.S.C. § 1341 is 20 years of imprisonment, 3 years of supervised release, and a $250,000 fine – increased to twice the gross gain or loss pursuant to 18 U.S.C. § 3571, which in this case is twice the gross gain to Pickerstein of $613,216.20.

In the plea agreement, the parties agreed to the following Guidelines calculation, which is

also reflected in the Presentence Report ¶¶ 22-32:

| | |
|---|---|
| Base offense level under U.S.S.G. § 2B1.1(a)(1) | 7 |
| Loss of more than $550,000 but less than $1,500,000, U.S.S.G. § 2B1.1(b)(1)(H) | +14 |
| Abuse of position of trust, U.S.S.G. § 3B1.3 | +2 |
| Acceptance of responsibility, U.S.S.G. § 3E1.1 | -3 |
| Total offense level | 20 |

A total offense level 20, assuming a Criminal History Category I, would result in a range of 33 to 41 months of imprisonment (sentencing table) and a fine range of $7,500 to $75,000, U.S.S.G. § 5E1.2(c)(3).  The defendant is also subject to a supervised release term of one year to three years.  U.S.S.G. § 5D1.2(a)(2).

**B. Restitution**

Pickerstein is statutorily required to pay restitution.  In the plea agreement, the defendant agreed to make total restitution in the amount of $633,410.04, of which $40,193.84 is payable to the victim; $10,000 is payable to Pickerstein's former law firm; and $583,216.20 is payable to Travelers Casualty & Surety Company of America ("Travelers") as more fully explained below.

This total restitution amount includes $613,216.20 that Pickerstein unlawfully withdrew from the Trust Account held for the benefit of the victim, and which the defendant spent for personal expenses of himself and his family.  The law firm promptly reimbursed the victim for that full amount, and Travelers in turn reimbursed the law firm for the majority of those funds. The parties agree that Pickerstein should be credited with already having paid $20,000 toward this restitution amount, based on funds otherwise due to him that were offset by the law firm. The parties agree that of the remaining amount, $10,000 is payable to the law firm, and $583,216.20 is payable to Travelers.

In addition, Pickerstein has agreed that restitution should include $15,000 as prejudgment interest payable to the victim, which represents a reasonable estimate of the interest that would

have accrued on the stolen funds between the time they were unlawfully withdrawn and the time

that the victim was reimbursed for the stolen funds.  *See United States v. Qurashi*, 634 F.3d 699

(2d Cir. 2011).   In addition, Pickerstein has agreed that restitution should include $25,193.84 in

legal fees accrued by victim during participation in the investigation of this offense.

Subsequent to Pickerstein's guilty plea, the victim (through his counsel) has submitted a

letter indicating his willingness to waive his claim to interest, and to reduce his claim for legal

fees to $25,000.[1]

## IV.  Discussion

At sentencing, a judge is required to: "(1) calculate[] the relevant Guidelines range,

including any applicable departure under the Guidelines system; (2) consider[] the Guidelines

range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *United

States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The § 3553(a) factors include: (1) "the

nature and circumstances of the offense and history and characteristics of the defendant"; (2) the

need for the sentence to serve various goals of the criminal justice system, including (a) "to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the

defendant, and (d) "to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner"; (3) the kinds of

sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements

issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities;

and (7) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

---

[1] Through counsel, the victim initially claimed $30,000 in attorney's fees.  At the request of the Government,
victim's counsel provided billing records for legal fees paid by the victim to an out-of-state law firm as a result of
the investigation and prosecution of the present offense, which totaled $25,193.84.  Accordingly, the latter number
forms the basis of the restitution provisions in the plea agreement.

The section that follows first addresses six arguments raised by the defendant's sentencing memorandum regarding the Sentencing Guidelines: (1) that the defendant's employment related contributions and good works warrant a downward departure pursuant to U.S.S.G. § 5H1.11, Def. Sent. Mem. at 3-12; (2) that the defendant's mental and emotional condition warrants a downward departure under U.S.S.G. § 5H1.3, Def. Sent. Mem. at 13-17; (3) that the defendant's physical condition warrants a downward departure under U.S.S.G. § 5H1.4, Def. Sent. Mem. at 17-18; (4) that the defendant's family ties and responsibilities warrant a downward departure under U.S.S.G. § 5H1.6; (5) that the fraud guideline in U.S.S.G. § 2B1.1 places an undue emphasis on the amount of the loss; Def. Sent. Mem. at 22-24; and (6) that Criminal History Category I overstates the defendant's likelihood of recidivism, Def. Sent. Mem. at 27-30.  The Government then addresses the § 3553 factors that are most relevant in the present case.

**A.  Guidelines issues**

**1.  U.S.S.G. § 5H1.11: Employment related contributions and good works**

The defendant argues that his employment related contributions and good works warrant a downward departure under U.S.S.G. § 5H1.1.  Def. Sent. Mem. at 3-12.  In support, the defense quotes a number of letters from friends, former colleagues, and clients who describe in concrete and personal terms their high regard for the defendant, the dedication that they witnessed throughout his legal career, and his generosity to younger lawyers and others.  The sincerity of these letters, and the consistency with which they depict the defendant's personal interactions with them, illustrates that he has clearly left a mark on those around him.  The question, therefore, is whether those interactions form a valid basis for departure within the structure of the Guidelines.

Section 5H1.11 states that "[c]ivic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." Because this is a discouraged factor under the Guidelines, a departure is warranted only if it is "'present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'" *Koon v. United States*, 518 U.S. 81, 96 (1996).  The courts have traditionally treated that as a high bar.  *Compare, e.g., United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."); *and United States v. Kohlbach*, 38 F.3d 832, 838 (6th Cir. 1994) (noting that it is "*usual* and *ordinary*" for high-ranking white-collar criminals to be community leaders), *and United States v. Barbera*, 2005 WL 2709112, at *13 (S.D.N.Y. 2005) (rejecting § 5H1.11 departure notwithstanding "letters submitted by Barbera from friends, family, former patients, police officers, doctors, business leaders, lawyers, and members of the clergy [that] attest . . . to the respect and admiration he has earned through his professional and charitable activities") *with United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming § 5H1.11 departure where defendant served six years in the Marines; served seven years as a volunteer firefighter, sustaining injuries in the course of duty three times, including once when he risked his life to rescue a three-year-old from a burning building; and twice administered CPR to strangers who suffered sudden heart attacks).  The letters submitted on behalf of the defendant paint a picture of a prominent career, with many episodes of laudable generosity.  By all reports, the defendant has been a valued friend, colleague, and family member.  But that is to be expected of someone in the defendant's position. And in certain respects, it is counterweighted by the fact that the

defendant's crime arises precisely out of the career that has earned him these plaudits – namely, he betrayed a longtime client's trust by pilfering his money over the two years he was incarcerated. Precisely because the defendant was such an experienced attorney, he had every reason to understand that stealing from his client was intolerable.  On balance, this weighs against a departure under § 5H1.11.

### 2.  U.S.S.G. § 5H1.3.  Mental and emotional condition

The defendant next argues that a downward departure is warranted under U.S.S.G. § 5H1.3 based on his mental and emotional condition.  Def. Sent. Mem. at 13-17.  Specifically, the memo summarizes reports from the defendant's treating psychotherapist, Dr. Kenneth Marcus, who opines that the defendant has an "unrealistic sense of *over* responsibility for the welfare of those important to him." Marcus Letter at 2. Dr. Marcus opines that the tragic death of the defendant's son magnified that tendency, and that "it is this over-responsibility for the welfare of his remaining children in large measure that subsequently led Mr. Pickerstein to commit acts for which he is standing before the Court." *Id.*  Notably, however, the defendant has also submitted a report by Dr. Madelon Baranoski of Yale, who stated that "[t]he testing results do not show any limitation, impairment, or disorder that would have prevented Mr. Pickerstein from appreciating the illegality of his behavior or from controlling his behavior." Baranoski Letter at 6. Instead, Dr. Baranoski has opined that "Mr. Pickerstein acted as the result of a confluence of circumstances," in which his "need for money had reached crisis proportions."  *Id.* Specifically, the IRS reportedly contacted the defendant in 2011 about accumulating back taxes, and the defendant worried that "if he were in trouble with the IRS, his practice and income would be jeopardized." *Id.*  As a result, he paid more than $400,000 to state and federal tax authorities from the victim's account. *Id.* Dr. Baranoski also reports various debts incurred by the

defendant as a result of the financial needs of his other family members, as well as other stressors in his life, including the merger of his law firm, his relationship with the victim client, and the recurrence of prostate cancer. *Id.* at 7-8.

The question for the Court is whether, in light of these reports, a downward departure is warranted under U.S.S.G. § 5H1.3. That policy statement provides: "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." There is sparse case law on the current version of § 5H1.3, which was adopted in 2010 – a paucity that is perhaps unsurprising, given that an appellate court has no jurisdiction to review a district court's discretionary denial of a downward departure. (Before 2010, § 5H1.3 provided that mental and emotional conditions were discouraged factors for departure; now they are neutral.) Nevertheless, some limited guidance can be drawn from the pre-2010 version of § 5H1.3. The leading case in the Second Circuit is *United States v. Barton*, 76 F.3d 499, 502 (2d Cir. 1996), in which the defendant's treating psychiatrist opined that the defendant showed "no evidence of psychosis," that his "sense of morality [was] significantly intact," and that he "appreciate[d] both the societal and moral constraints of his behavior." Notwithstanding the doctor's conclusion that the defendant had "untreated depression for many years in addition to the significant emotional problems which brought him into legal difficulties," the Court concluded that the defendant did not suffer from an "extraordinary" mental or emotional condition. *Id.*

On balance, the Government submits that the defendant's psychiatric reports do not establish that he suffered from mental or emotion conditions that are present to an unusual degree within the meaning of § 5H1.3. In the Government's view, it is most relevant here that

11

the defendant's own doctor concluded that "[t]he testing results do not show any limitation, impairment, or disorder that would have prevented Mr. Pickerstein from appreciating the illegality of his behavior or from controlling his behavior," and that the present offense was primarily the result of the "convergence of circumstances" described above – many of which represent the type of financial and professional stressors that many people face on a daily basis without resorting to theft. Baranoski Letter at 6.  Nevertheless, as discussed below, the Government agrees with the defendant that the factors identified under the heading of mental and emotional conditions may be appropriately considered by the Court when assessing the § 3553 factors.

### 3.  U.S.S.G. § 5H1.4.  Physical condition

The defendant argues that the defendant's prostate cancer constitutes a physical condition that merits a downward departure under U.S.S.G. § 5H1.4.  Def. Sent. Mem. at 17-18. That provision states: "Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.  An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."  (As with § 5H1.3, the first sentence quoted above was amended in 2010 to change it from a discouraged factor to a neutral factor.)

Based on the information provided by the defense, it does not appear that the defendant has a physical condition that warrants a downward departure under § 5H1.4.  Dr. Kaufman reports that the defendant has been treated for prostate cancer at various times since 2003, and

that in early 2016 it became resistant to current therapy.  The medical report states that the

prostate cancer "will ultimately require further treatment," and that the defendant "will now be

faced with an aggressive treatment regimen," such that "Mr. Pickerstein would benefit from

aggressive and careful monitoring of his prostate cancer."  Def. Sent. Mem. at 17-18.  Although

it is deeply unfortunate that the defendant faces progressive prostate cancer, the medical opinion

does not suggest that the requisite evaluation and treatment cannot be provided in any of the

medical facilities of the Federal Bureau of Prisons.  Nor does the opinion suggest that the

defendant has become "seriously infirm" as a result of his condition. Absent a concrete

indication that the defendant needs specific treatment regimes that are available exclusively in

his home community, this information does not warrant a departure under § 5H1.4.

### 4.  U.S.S.G. § 5H1.6. Family ties and responsibilities

The defendant argues that a downward departure is appropriate under U.S.S.G. § 5H1.6,

based on the physical and emotional needs of his wife, as well as the need to care for their three-

year-old grandson, who currently lives in their home.  Section 5H1.6 provides: "[F]amily ties

and responsibilities are not ordinarily relevant in determining whether a departure may be

warranted." In other words, § 5H1.6 is a discouraged factor for departure.  As relevant here,

Application Note 1(B) to § 5H1.6 provides:

(B)   Departures Based on Loss of Caretaking or Financial Support.—A departure under
this policy statement based on the loss of caretaking or financial support of the
defendant's family requires, in addition to the court's consideration of the non-exhaustive
list of circumstances in subdivision (A), the presence of the following circumstances:

(i)    The defendant's service of a sentence within the applicable guideline range will
cause a substantial, direct, and specific loss of essential caretaking, or essential financial
support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily
incident to incarceration for a similarly situated defendant.  For example, the fact that the
defendant's family might incur some degree of financial hardship or suffer to some extent

from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)   The departure effectively will address the loss of caretaking or financial support.

In support of this departure, the defendant has submitted letters from the defendant's wife and her treating physician, describing her medical condition as well as the responsibility that she and her husband have assumed in supporting their son and three-year-old grandson, who have been living with them since their son filed for divorce.  The defendant's financial statement, appended to the PSR, reflects that the defendant's wife works part-time, and that her modest monthly income is lower than that of the defendant himself.  PSR ¶ 43, addendum.  Moreover, it appears that the defendant's son who is living with them is currently gainfully employed as an accountant.

The Government believes that a downward departure is not appropriate here to reflect the defendant's family circumstances, in light of Application Note 1(B). First, it is a close call as to whether the defendant satisfies the first criterion, set forth in Application Note 1(B)(i).  On the one hand, the defendant has traditionally been the primary breadwinner for the family, and has provided critical emotional support as his sons have encountered personal and financial difficulties in their lives. He and his wife have always been there as a fallback when their family members have been in need.  But it is also clear that, since he resigned his law license, the defendant is not the only source of financial support for his family.  In addition to his wife's part-time income, and their Social Security payments, their adult son is reportedly an accountant with full-time employment who lives with them.  Specifically, although it seems clear that the

14

defendant's service of a sentence within the guidelines range would cause a "substantial, direct, and specific loss" of financial and emotional support to his family, it is less clear that removal of his financial support for some limited period would constitute the loss of "essential" support in this regard.

More importantly, the defendant does not appear to satisfy the second criterion outlined in Application Note 1(B)(ii), that the loss of caretaking or financial support "substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant."  White-collar defendants are often the primary earners in their family, with spouses and children who are entirely dependent on them for support. In the present case, the defendant has a son who lives with them who has full-time professional employment. Given the alternative source of income which is not typically present in the ordinary case, it would be hard to say that the defendant's family will encounter hardship beyond what is "ordinarily incident to incarceration." *Id.*  Many average citizens live on far more constrained incomes than this, and daily confront the question of how to cope with mounting debt. The present case is simply not analogous to the one cited by the defendant, where the defendant was effectively the sole caregiver and source of financial support for his family, including elderly and infirm parents.  *See United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) (affirming departure based in part on defendant's extraordinary family caretaking duties); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (same).

As discussed later in this memorandum, the Government agrees that all of these facts are appropriately considered under § 3553. But for purposes of analyzing a guidelines-based departure under § 5H1.6 and its accompanying Application Note, the defendant does not clear the relatively high bar for this discouraged basis for departure.

**5. The loss tables in U.S.S.G. § 2B1.1**

The defendant next argues that the advisory guideline range produced by U.S.S.G. § 2B1.1 places "misguided emphasis" on the amount of loss. Def. Sent. Mem. at 22-24. His argument relies on two case citations, neither of which stands up to scrutiny. First, he claims that the Second Circuit Court of Appeals "has observed that the fraud loss table is widely perceived to be 'broken,'" and "not based on empirical data." *Id.* at 23. To that end, however, he cites only a concurring opinion, which was not joined by the panel majority. *United States v. Corsey*, 723 F.3d 366, 378-79 (2d Cir. 2013) (Underhill, J., sitting by designation, concurring).[2] Likewise, the defendant cites *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.), for the proposition that "[e]mploying loss as the principal proxy for culpability in determining fraud sentences is a dubious proposition, if not contrary to the law." Def. Sent. Mem. at 24. Statistically speaking, however, a solid majority of district judges throughout the United States appear to disagree with the notion that § 2B1.1's emphasis on loss is generally dubious, much less even illegal. For example, according to Table 28 of the 2015 Sourcebook published by the U.S. Sentencing Commission, 7,853 defendants were sentenced in fiscal year 2015 using § 2B1.1 as their primary guideline. Putting aside the 1,945 defendants who received a government-sponsored motion for downward departure (primarily for substantial assistance), that leaves 5,908 defendants. Of that number, district judges imposed within-guideline sentences on fully 3,324 of those defendants. That means that most (56%) of the time, federal judges believe that § 2B1.1 is not only rational, but it's also right.

---

[2] In *Corsey*, various defendants were sentenced to up to 20 years in prison, based on a fraud scheme where the intended loss amount was, literally, off the charts. Despite the concurrence's expressed skepticism of the advisory guideline range yielded by § 2B1.1, on remand the district court re-adopted the same guidelines calculations and imposed sentences on the defendants of 15, 16, and 20 years apiece, diverging in two cases from the guidelines ranges for reasons unrelated to the supposed irrationality of § 2B1.1. The Second Circuit summarily affirmed all of those sentences, rejecting claims of procedural and substantive unreasonableness. *See United States v. Juncal*, Case No. 14-3357 (2d Cir. Apr. 6, 2016).

### 6. Criminal History Category I

Finally, the defense argues that Criminal History Category I overstates the defendant's likelihood of recidivism.  Def. Sent. Mem. at 27-30 (citing *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 8, 2007) (Gertner, J.)).  To this end, the defense points to statistical evidence that defendants with zero criminal history points have a lower recidivism rate than other defendants with a single criminal history point, and to similar evidence that defendants at Pickerstein's age (69) are dramatically less likely to recidivate.

The Government certainly agrees that, within the cohort of defendants who are in Category I, the defendant (like other first-time offenders) falls at the lowest end of the spectrum of likely recidivism.  But that does not mean that first-time offenders must either have their own category or risk being unfairly lumped together with recidivists.  It simply means that a court can sensibly consider imposing a sentence at the lower end of a given guideline range for a first-time offender, and a sentence at the higher end for those bumping up against the next criminal history category. *See, e.g.,* U.S.S.G. § 4A1.3(b)(2)(A) ("A departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited."); *id.* App. Note 3 ("A departure below the lower limit of the applicable guideline range for Criminal History Category I is prohibited under subsection (b)(2)(B) [*sic*], due to the fact that the lower limit of the guideline range for Criminal History Category I is set for a first offender with the lowest risk of recidivism.").  In any event, as discussed below with respect to specific deterrence, the Government agrees that the defendant poses an especially low likelihood of recidivism.  That is not because of his age; indeed, his age did not deter him from committing the instant offense. More importantly, the defendant has resigned his law license, and will never again have access to client funds.  Accordingly, it is highly unlikely that he will ever face a similar situation where

embezzlement is even a possibility.

**B.  Section 3553(a) factors**

The seriousness of the criminal offense itself, of course, is what gives rise to today's proceeding and therefore must be considered first among the § 3553 factors; indeed, it is the first goal of the criminal justice system listed in § 3553(a)(2).  Here, the defendant stole hundreds of thousands of dollars over the course of two years, which on its own would be a serious crime. Because federal courts generally deal in high-dollar civil lawsuits and criminal prosecutions, we sometimes become inured to the sheer magnitude of such crimes, as viewed through the eyes of ordinary citizens.  To give some perspective, median household income in the United States in 2014 was $53,657; the defendant stole more than 11 times that much.[3] The offense is all the more troubling because the defendant stole this money from his own client, thereby violating his fiduciary duty and his ethical obligations as a member of the bar.  Moreover, the defendant did so at a time when his client was incarcerated and therefore handicapped in his ability to monitor the defendant's stewardship of the funds – and, because the defendant had represented the victim for years, the victim had not the slightest reason to think there was a need for heightened vigilance. Additionally, the defendant committed the crime by repeatedly drawing from the victim's account as though it was his own – manifesting a deliberate long-term choice, rather than an impetuous one-time aberration. In short, the offense is serious, because it involved both a substantial and long-term pattern of theft, as well as a substantial betrayal of trust.

Promoting respect for the law is also important in this case.  First, in the eyes of the average citizen, the magnitude of this embezzlement is considerable, and punishment must be

---

[3] *See* Carmen DeNavas-Walt and Bernadette D. Proctor, Income and Poverty in the United States: 2014 (U.S. Census Bureau), *available at* www.census.gov/content/dam/Census/library/publications/2015/demo/p60-252.pdf (visited May 3, 2016).

proportionate to the offense.  Second, the defendant was a prominent member of the bar with a long and notable career as both a prosecutor and a defense attorney.  This particular factor cuts both ways.  On the one hand, as the many letters of support attest in striking detail, the defendant has served as an exceptional mentor and guide to many attorneys and friends over the years, leaving him with a legacy of service to the bar and his community.  On the other hand, the defendant's experience taught him better than most that it was a crime to steal his client's funds, and then to hide behind the misrepresentation that he had used the funds to cover unpaid legal bills.  In order to promote respect for the law, the sentence must achieve the difficult balance between recognizing the strong positive effect that the defendant has had on the many friends and colleagues who have written on his behalf, while avoiding any perception that a different (and more lenient) version of criminal punishment applies to a legal insider who has served both as U.S. Attorney and as a longtime defense lawyer.

General deterrence is another important purpose to be served by the sentence in this case, as manifested by the unfortunate recurrence of similar frauds by attorneys, financial advisors, and other trusted professionals.  Although the details of each case vary, the common thread of such prosecutions is that professionals often find themselves tempted to dip into funds of their clients or employers when their own finances are shaky.  In the first few months of 2016 alone, the judges of this district have sentenced defendants in cases involving embezzlement by a bookkeeper (*United States v. Tanner*, 3:15-CR-54 (JBA), sentenced on April 29, 2016, to 24 months for embezzling $800,000 over five years from a veterans' services organization, and failing to pay taxes on that income) and an attorney (*United States v. Clark*, 3:15-CR-193 (JBA), sentenced on January 13, 2016, to 45 months for stealing over $1.8 million from client's probate estate), and seen new charges filed against another attorney (*United States v. Ressler*, 3:16-MJ-

88 (WIG), arrested on complaint for allegedly embezzling nearly $800,000 from bankruptcy estates) and guilty pleas involving trusted employees (*United States v. Larsen*, 3:16-CR-14 (JAM), pleading guilty on January 26, 2016, to embezzling over $200,000 through false-invoice scheme; and *United States v. Mininberg*, 3:6-CR-10 (SRU), pleading guilty on January 15, 2016, to embezzling $250,000 for personal expenses). The prosecution in this case has sent a clear message that stealing client funds will be detected and prosecuted; the sentence should send the message that it will also be appropriately punished.

Although the defense suggests that the public nature of the defendant's resignation from the bar and the "resulting public shame and humiliation" satisfy any need for general deterrence, Def. Sent. Mem. at 26, the fact that embezzlements and frauds recur with depressing frequency undermines the notion that fear of shame is enough to deter potential wrongdoers. Moreover, treating a prominent figure's fall from public grace as a reason for imposing a lower sentence would unjustly favor the prominent, successful, and highly regarded (in other words, those who have farther to fall) over the poor, the friendless, and the unknown.  That would run contrary to the dictate of 18 U.S.C. § 3553(a)(2) that a court must avoid unwarranted sentencing disparities.

The Government agrees with the defense that specific deterrence is not an issue in this case.  The offense here was a crime of opportunity, which presented itself when the defendant was entrusted with an escrow fund, controlled by his own signature, held for a longtime client who was incarcerated.  The defendant is no longer a member of the bar, and there is no reason to believe that he would ever again be in a position to engage in similar conduct.

Finally, there are the questions of just punishment and avoidance of unwarranted sentencing disparities.  These depend on what is typical, and what is not, about this crime and this defendant. Looking first at the crime, the embezzlement here was fairly standard fare.  The

defendant took money over a two-year period; it was not a one-time aberration. He stole it from a client who trusted him, and who accordingly did not realize the crime had occurred until much time had passed. The amount of money stolen was significant, exceeding $600,000.  The money was spent on expenses for himself and his family members, which is also typical.

In other ways, his offense was somewhat less typical.  Unlike some offenders, the defendant did not spend the money primarily on luxuries like vacations, speedboats, and gambling.  He spent the majority on his taxes, and the remainder seems to have gone to living expenses.  He did not live lavishly, and incurred significant debt to support family members who were in financial need. In terms of victim impact, the defendant's law firm promptly reimbursed the victim, who has now been made whole, and who has expressed the hope that the defendant not be sentenced to a prison term.  Most of the restitution obligation is now owed to the insurance company that reimbursed the law firm.

Turning to the defendant, his acceptance of responsibility appears to be complete and genuine – though not truly exceptional, given that he waited until he was caught.  From the time the victim confronted him, the defendant admitted that he took the money for himself.  Perhaps the defendant rationalized to himself, as many offenders do, that he deserved the money he took – whether for legal services that should've been billed, or disruptions to his law practice that arose from his representation of the victim.  Or perhaps he thought that the victim would simply let him keep the money if he was ever caught.  But once confronted, he admitted the fraud to the victim and later his law firm, and resigned his law license.  And after the Government contacted defense counsel, he consistently indicated his willingness to admit his wrongdoing and plead guilty. For this reason, the Government has agreed to move for the third point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

Finally, there is what Dr. Baranoski described as the convergence of circumstances that motivated the defendant.  Her analysis captures many of the reasons – some typical, some less so.  Like many white-collar defendants, he was in debt.   The immediate trigger for the thefts was his inability to pay his overdue taxes.  His financial situation had deteriorated due to the debts he had incurred to support his family, and his law practice had been suffering.  He felt intense pressure to avoid tax problems that might further jeopardize his law practice, to avoid public humiliation, and most importantly to support his family.  Not only are these stresses common in many white-collar embezzlement cases; they are the sorts of financial problems that countless citizens deal with every day, trying to make ends meet.  Most do not resort to crime.

Other circumstances are concededly less typical.  The defendant's perceived need to support his family was unusually accentuated by the tragic death of his son about twelve years earlier, and he was helping his other sons to cope with personal challenges of their own.  He was dealing with a recurrence of prostate cancer that had become resistant to treatment. This is when the tempting opportunity presented itself.  His relationship with the victim was different from, and closer than, the typical arms-length relationship between attorney and client, and he found himself entrusted with an escrow account containing millions of dollars. Fortunately, the victim has been made whole by the law firm (and the law firm mostly by the insurance company), so the harm suffered by the victim has been mitigated to a significant extent.

**V.  Conclusion**

In summary, the Government believes that the advisory Guideline range of 33-41 provides the correct starting point for the Court's sentencing determination, and that the defendant's circumstances do not warrant any departures pursuant to the various provisions of Chapter 5 of the Sentencing Guidelines.  The Government agrees that some degree of downward variance, however, may be appropriate in light of the combination of personal characteristics

present here.  In particular, the Government recognizes that the defendant has a serious health condition that will require ongoing treatment, and that he will continue to play a central role in supporting family members who have encountered serious challenges in their lives.  He poses a low risk of recidivism given the loss of his law license, so specific deterrence is not a factor here. These are mitigating factors that weigh in the defendant's favor.

The Government also respectfully submits, however, that this is a serious offense. As a former U.S. Attorney, and a longtime defense lawyer, the defendant knew that embezzling his client's money was criminal; that it was unethical; that it was a betrayal of trust; that he would eventually get caught; and that it would cost him his career and his reputation. So many of the letters of support written by his friends and colleagues express astonishment that he would ever commit such a crime.  But he did.  In order to promote respect for the law, and to send a message of general deterrence, a sentence involving some period of incarceration is appropriate.

/s/
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT
Federal Bar Number: ct16012
157 Church Street, 25th Floor
New Haven, CT 06510
Phone: 203-821-3700
Fax: 203-773-5376
William.Nardini@usdoj.gov


LORETTA LYNCH
ATTORNEY GENERAL OF THE UNITED STATES


PREET BHARARA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 4th day of May, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ William J. Nardini
_____
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY