1         UNITED STATES DISTRICT COURT

2            DISTRICT OF CONNECTICUT

3  - - - - - - - - - - - - - -  x
                               :  Case No.16cr9(VAB)
4  UNITED STATES OF AMERICA,    :
                               :
5            Government,        :
         vs.                    :
6                               :  915 Lafayette Blvd
   HAROLD JAMES PICKERSTEIN,    :  Bridgeport, CT
7                               :  May 10, 2016
            Defendant.          :
8  - - - - - - - - - - - - - -  X

9        TRANSCRIPT OF SENTENCING HEARING

10  BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.

11
   APPEARANCES:
12  FOR THE GOVERNMENT:      WILLIAM NARDINI, ESQ.
                           U.S. Attorney's Office
13                         157 Church Street
                           New Haven, CT 06510
14

15

16  FOR THE DEFENDANT:      ANDREW B. BOWMAN, ESQ
                           Law Offices of Andrew Bowman
17                         1804 Post Rd. East
                           Westport, CT 06880
18

19                         WILLIAM DOW, ESQ
                           Jacobs & Dow
20                         350 Orange Street
                           New Haven, CT 06503
21

22

23            Sharon Montini, RMR, FCRR
                 915 Lafayette Blvd
24             Bridgeport, CT 06604
              Official Court Reporter
25

1            THE COURT:  Good afternoon.  Please be

2    seated.  We're here in United States v. Harold

3    Pickerstein.

4            Will counsel, please, state their

5    appearances for the record.

6            MR. NARDINI:  Good afternoon, your

7    Honor.  For the United States, Assistant U.S.

8    Attorney William Nardini.  With me at counsel table

9    is Special Agent Jeff Waterman of the FBI.  And I'd

10   also note for the record the presence of the U.S.

11   Probation Office, Senior Probation Officer Ray Lopez

12   and U.S. Probation Officer John Wackerman.

13           THE COURT:  Good afternoon, all.

14           MR. BOWMAN:  Good afternoon, your Honor.

15   For the defendant, Andrew Bowman.

16           MR. DOW:  Good afternoon, your Honor.

17   William Dow for Mr. Pickerstein as well.

18           THE COURT:  All right.  On January 14,

19   2016, the defendant, Harold Pickerstein, appeared

20   before me and entered a guilty plea to Count One,

21   which charged the defendant with mail fraud, in

22   violation of 18 U.S.C. Section 1341.  A presentence

23   report was thereafter prepared for the Court by the

24   United States Probation Office.  The initial report

25   was dated April 18, 2016.  I have reviewed that

1   report, the first addendum to that report --

2   April 18th, I'm sorry.  The first addendum to the

3   report dated April 18th, the second addendum to the

4   report dated May 6, and I've consulted with its

5   principal author, U.S. Probation Officer John

6   Wackerman, as well as Senior Officer Ray Lopez.

7   I've also reviewed the sentencing recommendation,

8   the government's memorandum, the defendant's

9   memorandum, the declaration of the defendant's net

10   worth and cash flow, and the various character

11   letters.

12         Mr. Bowman and Mr. Dow, have you and

13   your client read and discussed the presentence

14   report and the addenda to it?

15         MR. BOWMAN:  Yes, we have.

16         THE COURT:  Do you have any objections

17   to any of the factual statements in the presentence

18   report?

19         MR. BOWMAN:  No, your Honor.

20         THE COURT:  Mr. Nardini, does the

21   government have any objections to any of the factual

22   statements in the presentence report?

23         MR. NARDINI:  No, your Honor.  We'd ask

24   that the Court adopt the factual findings.

25         THE COURT:  All right, there being no

1  objections, the Court will adopt the factual

2  statements contained in the presentence report as

3  its findings -- and the addendum as its findings of

4  fact in this case.

5          I also accept the plea agreement signed

6  on January 14, 2016, and filed January 14, 2016.  I

7  am satisfied that the agreement and the stipulation

8  of offense conduct and rider concerning restitution

9  attached to the agreement adequately reflects the

10  seriousness of the actual offense behavior and

11  accepting it will not undermine the purposes of

12  sentencing.

13          You can sit, Mr. Bowman.  That's fine.

14          The defendant faces the following

15  maximum and minimum penalties:  Imprisonment, under

16  18 U.S.C. Section 1341, Mr. Pickerstein faces a term

17  of imprisonment of up to 20 years and no minimum

18  term of imprisonment.  With respect to fines, under

19  18 U.S.C. Section 3571, Mr. Pickerstein faces a

20  maximum fine of $1,226,432.40.  In terms of

21  supervised release, Mr. Pickerstein faces no minimum

22  term of supervised release and a maximum term of

23  supervised release of three years.  If he was to

24  violate any condition of supervised release, the

25  Court could then sentence him to additional time in

1   prison of as much as the statutory maximum of two

2   years.

3           With respect to probation, because the

4   instant offense is a class C felony, the defendant

5   is eligible for probation.  The authorized term is

6   one to five years under 18 U.S.C. 3561(c).

7           Under 18 U.S.C. Section 3556, the Court

8   shall also order restitution to the victims of the

9   offense in accordance with 18 U.S.C. Section 3663A

10  and 3664.  The restitution amount is $633,410.04.

11  In addition, under 18 U.S.C. Section 3013, I must

12  impose a mandatory special assessment of $100 on

13  each count of conviction, for a total of $100.

14          Do either counsel have any objection or

15  correction to that statement of the maximum and

16  minimum penalties in this case?

17          Mr. Nardini?

18          MR. NARDINI:  No, your Honor.

19          THE COURT:  Mr. Bowman?

20          MR. BOWMAN:  No, your Honor.

21          THE COURT:  Are there any motions at

22  this time?

23          MR. NARDINI:  Yes, your Honor.  The

24  government would move that the defendant receive a

25  third point off the guidelines for acceptance of

6

```
1    responsibility as set forth in our sentencing memo.

2                THE COURT:  Thank you, Mr. Nardini.

3    That motion is granted.

4                The sentencing guidelines appear to have

5    been -- yes, I'm sorry, Mr. Bowman, did you have a

6    question?

7                MR. BOWMAN:  Your Honor, to the extent

8    that it is necessary, given our sentencing

9    memorandum, we, of course, are moving for a downward

10   departure or a variance below the guideline range.

11               THE COURT:  All right.  Thank you, Mr.

12   Bowman.

13               With respect to the sentencing

14   guidelines, which appear to have been correctly

15   calculated in the presentence report, there is a

16   total offense level of 20, a criminal history

17   category of I.  The resulting sentencing guideline

18   range is:  Months' imprisonment, 33 to 41 months;

19   years of supervised release, one to three years;

20   probation, under the guidelines, ineligible; a fine

21   of 7,500 to 75,000; and a mandatory special

22   assessment of $100.

23               Are there any objections to that

24   calculation of the United States sentencing

25   guidelines or the resulting sentencing guideline
```

1    range?

2              Mr. Nardini?

3              MR. NARDINI:  No.

4              THE COURT:  Mr. Bowman?

5              MR. BOWMAN:  No, your Honor.

6              THE COURT:  All right.  Is there -- Mr.

7    Nardini, is there any victim present who wishes to

8    address the Court?

9              MR. NARDINI:  Yes.  Attorney Hugh Keefe

10   is here present on behalf of the victim, Mr.

11   Galante, and I believe he may wish to briefly

12   address the Court.

13             THE COURT:  All right, fine.

14             Go ahead, Mr. Keefe.  We can hear from

15   you now.

16             MR. KEEFE:  Now?

17             THE COURT:  Yes, sir.

18             MR. KEEFE:  May it please the Court, I

19   wrote Mr. Nardini a letter dated January 18, 2016.

20   Did you get a copy?

21             THE COURT:  I have, Mr. Keefe.  I've

22   received and reviewed your letter.  Thank you so

23   much.

24             MR. KEEFE:  I talked with Mr. Galante

25   since then, the most recent being an hour ago, and

1    he fully affirms everything in that letter.  He's

2    known Mr. Pickerstein for over 25 years.  He has a

3    very high regard for him notwithstanding this

4    offense.  He himself was recently released from

5    prison and he knows what it does to an individual

6    and that individual's family.  He respectfully asks

7    this Court to do the extraordinary thing in this

8    case, an extraordinary thing by giving Mr.

9    Pickerstein every benefit that he deserves and

10   giving him a sentence of straight probation.

11           I would like to read this letter in its

12   entirety; however, I forgot my glasses and the pair

13   I have does not do it, but your Honor has it anyhow,

14   and it certainly just expands on what I've just

15   said.

16           THE COURT:  Do you want to have someone

17   else read it into the record?

18           MR. KEEFE:  I don't think it's

19   necessary.

20           THE COURT:  That's fine.  We can have it

21   submitted and placed in the report.

22           MR. KEEFE:  Thank you, your Honor.

23           THE COURT:  Mr. Bowman, before I proceed

24   to sentencing, I'd like to give you an opportunity

25   to make any statements you wish to make on Mr.

```
1    Pickerstein's behalf, including any argument in

2    support of a downward departure or non-guideline

3    sentence.

4              Mr. Pickerstein, you, of course, have

5    the right to make a statement today.  You are not

6    required to, but I would be interested in anything

7    you have to say and your lawyer and what other

8    witnesses, so forth, you have.  Then I'll hear from

9    Mr. Nardini.

10             Mr. Bowman.

11             MR. BOWMAN:  Thank you, your Honor.

12   Your Honor, with the Court's permission, there are

13   four people who would like to address the Court, and

14   I thought it would be kind of logical from our point

15   of view.  They are Joe Martini, James Cowdery, Eric

16   Breslin and Lyn McCarthy.

17             If I could ask Mr. Martini to come up.

18             THE COURT:  That's fine.  Thank you.

19             MR. MARTINI:  Good afternoon, your

20   Honor.

21             THE COURT:  Good afternoon, Mr. Martini.

22             MR. MARTINI:  Thank you for the

23   opportunity to address the Court and talk about Jim.

24   I met Jim -- I was trying to think of the exact

25   date, but I couldn't pin it down.  But it was the
```

1    early 1990s, and I was an assistant U.S. attorney at

2    the time, and Tom Murphy, who is now Jamie Cowdery's

3    law partner, and I were prosecuting a case against

4    Jim's client before Judge Cabranes and a jury.  It

5    was a difficult case, your Honor.  It was a hard

6    fought case.  I still remember today Jim's vigorous

7    defense, his effective cross-examination of an

8    extremely experienced IRS special agent, and his

9    passionate closing to the jury.

10               Jim was a terrific lawyer, your Honor,

11   and I think everyone -- and there are so many of his

12   peers and terrific defense lawyers in the gallery,

13   and I think everybody would agree with that

14   sentiment.  Jim was terrific, and I was proud every

15   time I walked into the courtroom with him.

16               Thankfully for me after that case Jim

17   and I remained friends, and in 1998 I became his law

18   partner at the firm that was then known as Pepe &

19   Hazard.  And Lou Pepe is also here in the gallery

20   today.

21               Jim and I were law partners for nine

22   years.  In 2007, I joined Wiggan & Dana.  I left

23   Pepe & Hazard, joined Wiggin & Dana, where I am now,

24   but Jim and I continued to be friends and we would

25   refer cases back and forth to each other and get

1   together on occasion.

2          Your Honor, being Jim's partner, his law

3   partner, was an incredible privilege, and it was so

4   valuable to me, especially as a young lawyer.  I had

5   come to the U.S. Attorney's Office from New York.  I

6   came to the U.S. Attorney's Office in Connecticut

7   where I didn't really know many people.  I met a lot

8   of people as an assistant, obviously, but joining

9   private practice was different.  I was joining a

10  private practice in Connecticut with no business to

11  speak of -- or no business at all, and very few

12  contacts in Connecticut.

13         And Jim -- and my story is not unique.

14  I saw a bunch of people in the audience today,

15  Calvin Woo, Jim Filan, Bobby Lacobelle, who I'm sure

16  had the same experience.  Jim took me under his wing

17  and he introduced me to so many people.  I met

18  community leaders in town, I met prominent

19  businesspeople, I met experts who I still use today,

20  and I became friends with some of the real giants of

21  the defense bar, and luckily Jim has two of them in

22  Andy and Willie here with him this afternoon.

23         Jim and I went to lunch every day, or

24  almost every day, and we talked.  We talked about

25  books; Jim is an avid reader, and his sophistication

1   was well above mine, so I actually learned a lot

2   about literature.  We talked about sports, and we

3   gossiped.  It was fun, for sure, your Honor, but it

4   was also a privilege.  I was proud to be out with

5   Jim.  I was proud to be his partner and proud to be

6   his friend.  And like all of us here today, I am

7   still proud to call him my friend.

8           And without fail, whenever we were out

9   at a restaurant or wherever we were eating, a friend

10  or a former client or somebody from the community or

11  somebody from the synagogue where Jim was so

12  actively involved at, Beth El, he would meet

13  somebody from one of those walks of life.  I was

14  always amazed by this.  It was clear to me Jim meant

15  something very special to these people.  It wasn't

16  just a shake and hi and how have you been.  It

17  always occurred to me that Jim must have done

18  something really special to them, brought some

19  measure of joy or brought some comfort to their

20  lives.

21          Jim and I also shared Giant tickets.

22  And we went to ball games together; we were both

23  Yankee fans.  We tussled a little bit over who would

24  get the best tickets to Giant games.  Jim didn't go

25  to the games, but he tussled over the tickets with

1    me because he wanted to give them to his kids.  He

2    had no interest in going to the games.

3            Jim, your Honor, officiated at my second

4    wedding in 2005, and I have in my office a picture

5    from the wedding that I cherish that shows Jim

6    standing on the beach in -- you know, as he always

7    is, well dressed, in incredible heat, reading

8    wedding vows that he drafted himself for us and

9    which we still have.

10           Your Honor, Jim has touched so many

11   lives in so many ways:  As a lawyer, of course; as a

12   husband to Marjorie; as a father and grandfather to

13   his children and grandchildren; as a friend; as a

14   mentor to me and others.  I would venture to say

15   that everybody in this courtroom, if they had the

16   opportunity, could describe how Jim has made their

17   lives better.  No one can match his kindness and his

18   generosity or be a better friend.

19           There is a saying I heard once, and I'm

20   going to attribute it to George Steinbrenner because

21   I know Jim would get a kick out of that.  I'm not

22   sure he was the original proponent of this, but it

23   goes like this, that if you do something for someone

24   and more than two people know about it, then you are

25   doing it for the wrong reason.  And that was Jim.

With him, he did things for people for the right
reason, because he cared.  And those who knew Jim,
like myself and everybody else in this courtroom,
received a tremendous gift just by watching him.
After knowing Jim, you couldn't help but to be moved
towards doing something more for someone who you
knew, a client, a family member or a friend.

Jim and Marjorie and his other friends
who I came to know were always so generous and
loving towards me and my family.  We shared happy
times, for sure, and Jim was always there for me
when things went sour for me.  When I was going
through a divorce, for example, Jim was my sounding
board and he suggested I speak with a lawyer in town
named Bonnie Amendola about representing me.  I did
go to see Bonnie, and she was a perfect match for
me, and together she and Jim helped me get through a
very difficult time in my life.

There was another occasion where I had a
serious bout of vertigo, and I'm sure Jim will
remember this because I couldn't walk and I couldn't
drive, and I had to go to court and I had to go here
and there, and Jim took me.  Jim found a neurologist
for me to see.  He took me to see the doctor.  I can
remember him sitting in the waiting room waiting for

1    me to finish my appointment, taking care of

2    business, to the extent that he could, and taking me

3    home.  Those are just a few examples.

4            Because of the way he lived like that,

5    he was larger than life, and I think we all thought

6    he was superhuman almost.  But we've learned that

7    he's human after all, and we know that humans make

8    mistakes and they make errors in judgment.

9            Your Honor, Jim has paid, and continues

10   to pay, dearly for his mistakes.  He's lost his

11   legal career, and I can't imagine the pain Jim felt

12   from that.  That's an incredible punishment from

13   someone who so cherished the law and being a lawyer

14   and so loved all things about the law, everything.

15           And I don't think in a million years Jim

16   would want anyone to talk about his acts of

17   kindness, but in this context we all want to and

18   must.  I'm looking at Judge Daly, and I was talking

19   about this with some of the other lawyers who

20   practiced in this courtroom over the years before

21   Judge Daly, Judge Daly use to say, long before Judge

22   Rakoff said it a little differently in that *Adelson*

23   decision which is so quoted so often in this

24   context, judge Daly use to say that sentencing is

25   the time when someone cashes in the credits that

they earned for all of the good things that they did in their life.

In Jim's case, those credits were earned for doing good for so many people and for all the right reasons and despite his own personal tragedy. And despite his own personal hardships, he never wavered from the person I described to you. Regardless of what was going on in his life, he was always there for the other person, whether it be a client, a friend or a family member.  And because he earned those credits that way, your Honor, I submit to you that the value of those credits so far outweighs the consequences of the mistake that he made in this case, and that the true measure of Jim Pickerstein is reflected in all of us here today and all of the things that he's done for all of us.

I know your Honor has read -- I know you can only hear from four of us, but I know there were other letters submitted, and I would bet that they express very similar sentiments to those that I'm expressing to the Court, and I know that your Honor will take all of those thoughts to heart and take the full measure of Jim Pickerstein into account this afternoon.

I thank you for the opportunity.

```
1              THE COURT:  Thank you, sir.
2              MR. COWDERY:  Good afternoon, your Honor
3    I am Jamie Cowdery.  I'm one of those people Joe
4    Martini just mentioned, someone who was deeply
5    touched by Jim Pickerstein.  Sadly, I go back a
6    little further than Joe.  I met Jim Pickerstein when
7    he was an assistant United States attorney, and
8    while Joe couldn't remember exactly when he met Jim,
9    I remember exactly when I met Jim.
10             I had just been hired into the U.S.
11   Attorney's Office -- and I mentioned this in my
12   letter, your Honor -- out of a civil practice firm.
13   And I tell this story, your Honor, because, for me,
14   I think in pictures and I talk in stories, and the
15   task of the Court is to get an idea of who this
16   person is in front of you because you haven't had
17   the opportunity to live with him and work with him.
18   As far as I know, there are only two ways to do
19   that; one is with gifted words to convey concepts,
20   and I can't do that, but what I can do is tell you a
21   story, and that's what I'd like to do.
22             I came into the U.S. Attorney's Office
23   still a young man, and I was scared to death.  I
24   didn't know anything about the criminal law, and it
25   just happened that the day I got into the U.S.
```

1    Attorney's Office they had taken down a wiretap on a

2    big motorcycle gang and there were agents running

3    around with guns and agents running around with

4    evidence bags, and here I was, having, you know,

5    read some United States Supreme Court cases, and Jim

6    Pickerstein was showing me around.  And I must have

7    made some squeak or something because he said,

8    "What's the matter?"  And I said, "I don't think I'm

9    prepared for this."  And he said, "Relax, it's not

10   rocket science.  These people you are looking at,

11   they don't know as much as they think they do, and

12   you probably know a lot more, so relax."  And then

13   he said, "Some of the best assistant United States

14   attorneys came out of civil backgrounds."

15           Well, you know, it was exactly the right

16   thing to say.  Excuse me.  It was typical of Jim

17   because it was decent and kind and thoughtful, and,

18   at the same time, light enough and self-effacing

19   enough that it didn't become tedious.  And it made

20   all the difference to me because I felt -- I went

21   from feeling like I don't belong here, I'm never

22   going to survive here, to I can do this.

23           Now, unfortunately, it didn't prevent me

24   from making mistakes because I certainly did, and we

25   had a disastrous ruling in a case that I was working

1    on and I thought the world was going to end, and Jim

2    once again came to me and helped plot out a way

3    forward and to reassure that it was going to work

4    out, and it did.

5            So this is a man, your Honor, who I love

6    and respect.  When we were in the U.S. Attorney's

7    Office together, Jim made sure that we behaved

8    justly; not just professionally, but justly.  I

9    remember a story, and I mentioned it in my letter,

10   but it's worth telling.  When you -- I start in the

11   office and I'm terrified.  After a few years in the

12   office I think I know everything, and it's very easy

13   in that job to think that you are just automatically

14   because you are in the job and then it's all about

15   winning.  There was an individual who probably

16   reasonably understood, or might have reasonably

17   understood, that he had a promise of immunity, but

18   I'm confident that we could have won otherwise.  I

19   mentioned it to Jim and he said, "Absolutely not, we

20   don't do that."  And he was right.

21           And this is a man who not only is kind

22   and decent, but is just and fair, and it's why I

23   respect him so much.

24           Since he left the U.S. Attorney's Office

25   and I left the U.S. Attorney's Office and we have

 1   done this for a living, he has never changed.  He's

 2   someone to whom I don't hesitate to refer cases.  He

 3   always took care of the cases that I referred to him

 4   and he always behaved in the highest traditions of

 5   the bar.

 6            So this is a person who has helped me in

 7   so many ways and has been so kind and decent to me

 8   that I hope, your Honor, that my words today have

 9   done him justice because he's earned it.

10            Thank you.

11            THE COURT:  Thank you, Mr. Cowdery.

12            MR. BRESLIN:  Good afternoon, your

13   Honor.

14            THE COURT:  Good afternoon, sir.

15            MR. BRESLIN:  My name is Eric Breslin.

16   I was one of the people who wrote a letter.  I

17   practice in New York.  I know there are lawyers here

18   from New Jersey.  So while Jim is revered in

19   Connecticut, and I think justifiably so, I think

20   it's important that your Honor know that his reach,

21   his scope and his reputation and his acts of

22   goodness extended even bound beyond this state.

23            I've been Jim Pickerstein's friend for

24   over 30 years.  Your Honor, Jim Pickerstein is a

25   person you go to when you have a problem.  Now, Mr.

```
 1    Bowman was good enough to share with me some of the
 2    letters that have been submitted to the Court, and
 3    this fact comes shining through.  In so many of
 4    them, whether you were a young AUSA in the District
 5    of Connecticut who was in over your head, whether
 6    you were a member of his synagogue or his community,
 7    whether you were a criminal defense colleague, a
 8    member of his family or his friend, it didn't
 9    matter, Jim Pickerstein has always been a person
10    that you went to with your problems, and I have seen
11    it and experienced it.  If it was a question of
12    evidence or tactics, you went to Jim.  If it was a
13    personal or practice issue or a business issue, you
14    went to Jim.  If you just needed a laugh or a pat on
15    the back or recognition or reaffirmation that being
16    a lawyer in this day and age is not the easiest way
17    to make a living, you went to Jim.  In fact, the
18    only thing I did not go to Jim for is driving me
19    anywhere from place to place because he is, frankly,
20    a terrible driver.  So I would seek lifts from some
21    other people.
22            This has been so in my own life.  A
23    divorce, had to be a single father to two small
24    children, a business reverse, an adverse verdict, I
25    have always known that in Jim there was a person on
```

1    the other end of the telephone or across the table

2    who genuinely loved me and cared for me and would

3    try to make things better, or at least make me

4    smile.

5              So, your Honor, if I could, I would pose

6    a question to this Court.  What does it say about a

7    man to be someone from whom others affirmatively

8    seek support and comfort and who provides it over

9    and over again?  I think it says that there is

10   something genuinely good and worthy at the core of

11   that person, that his essence is pure, although his

12   conduct may have fallen short.  And certainly this

13   has been my experience with a man of extraordinary

14   kindness and vitality and generosity who has touched

15   and improved my life in meaningful ways.  Jim is one

16   of the finest people I have ever known, and this

17   case, although tragic, will have no impact on my

18   view of him and the kind of person I know him to be.

19             Now, it has not been easy to be Jim

20   Pickerstein, and I think the Court knows that.

21   There has been loss and pain and terrible emotional

22   burdens, and I have seen from observing Jim that a

23   capacity for compassion and a desire to help others

24   does not automatically translate into happiness or

25   peace in one's own life.  It would be nice if it

1   did, but it does not.  And it's hard to be a man

2   with answers at all times for all people.  It's hard

3   to be the person that people go to, and it's hard to

4   be a person who feels the need to fix things for the

5   people you care about, because you can't.  You try,

6   you do your best, but ultimately you fail.  And the

7   more you love and the more you care and the wider

8   the circle of people that you love and who love you

9   back, the more certain is your ultimate failure.

10          And that is how I see Jim and that is

11   how I ask your Honor to see Jim, a person of love

12   and goodness, who tried to help and comfort and fix,

13   but who stumbled as he approached the finish line,

14   and who fell, and to see the hero in him and in the

15   life that he has led, to recognize this sin, which

16   he has acknowledged, but to see that first and

17   foremost that he has led a heroic and good life and

18   to take that into consideration today.

19          Thank you.

20          THE COURT:  Thank you, sir.

21          Ma'am, if you are more comfortable doing

22   it from the table.

23          MS. McCARTHY:  No, your Honor, I'll

24   stand.  Thank you.

25          THE COURT:  That's fine.

1          MS. McCARTHY:  Good afternoon, your

2     Honor.  I thank you very much for allowing me to

3     speak on behalf of my dear friend Jim.  Before I

4     begin, I need to tell you how important it was for

5     me to be here today.  I was just discharged from the

6     hospital on Saturday.

7          I'm Lyn McCarthy, and I am not an

8     attorney.  I am here today to speak on behalf of my

9     very dear friend Jim.  Jim and I met 14 years ago.

10    My husband had to retain him in a criminal matter,

11    and that was the first time we ever met.

12          During the 14 years, he has really

13    turned into a very, very close and dear friend to me

14    personally.  The first few years of the criminal

15    matter he was a rock personally for me.  He showed

16    me strength and he walked me through all of the

17    procedures that were going to be going on.  Never

18    once did he not pick up the phone if I had a

19    question for him.  He was there for me 24/7.  And to

20    this day and going forward, I will always be

21    grateful for him and for what he did for me

22    personally.

23          That was the beginning of our

24    relationship.  As I said, he has been a continual

25    friend to me up until as we speak today.  What the

1    other attorneys spoke about previous to me is

2    everybody went to him for a question always, but

3    what they didn't speak about is what he would do for

4    others.

5            As I said, the two weeks I was in the

6    hospital, it was: "Do you need anything?"  "Can I

7    get you anything?"  "Do you ride a ride?"  "Do you

8    need help shopping?"  "Do you need help at home?"

9    "What can I do for you?"  "What can I do for you?"

10   "What can I do for you?"

11           I wish I had something he could have

12   done for me because there really was nothing, but he

13   was there for me, as I know he is for all of his

14   friends in the community here in Connecticut, in New

15   York, and wherever else he has friends.

16           He has been a model husband to Marjorie

17   for many, many years, a wonderful father, and also

18   an exemplary and wonderful grandfather.  He now has

19   taken on caring for one of his grandchildren, and,

20   again, he shows his children, his grandchildren,

21   what it is to be a good, solid man.

22           Jim has suffered some personal losses as

23   well as his professional loss these past couple of

24   years.  I think Jim has suffered enough in his

25   lifetime.  He knows that he made a mistake.  People

1    make mistakes.  People need to be forgiven.

2              So I just want to end by thanking you

3    again and hoping that my words will resonate with

4    you.  And, again, I just want to say what an

5    exemplary person Jim is and what a wonderful friend

6    he's been to me for 14 years.

7              Thank you, your Honor.

8              THE COURT:  Thank you, ma'am.

9              MR. DOW:  Good afternoon, your Honor.

10             THE COURT:  Good afternoon, Mr. Dow.

11             MR. DOW:  There is a schtick that

12   lawyers use when talking about their clients, it's

13   an honor to represent the individual.  This is not a

14   schtick.  It is an honor to represent Jim

15   Pickerstein.  I will address your Honor and speak to

16   your Honor as a friend of Jim, as a colleague, and

17   as an advocate, if I can.

18             Jim -- your Honor has read the letters

19   that have been submitted.  Your Honor, I think, has

20   a sense of who he is.  But this a fellow who defines

21   himself by helping others.  I met Jim in 1974.  I

22   had been practicing in Washington D.C., Jim

23   Pickerstein was the acting United States attorney,

24   and he hired me.  I wanted to come back to

25   Connecticut; I had a small family at the time, I

```
 1    wanted to come back and be with my family.  That

 2    decision was the most important decision that was

 3    ever made in my professional life.  Without that

 4    decision, I wouldn't be standing here today speaking

 5    on his behalf or anybody's behalf.  I don't know

 6    what I would have been.

 7              But he made that decision, and once that

 8    decision was made, he guided me, and has continued

 9    to guide me as an attorney and as a friend

10    throughout.

11              Now, as a colleague, I can only echo the

12    things that have been said by the three lawyers who

13    preceded me and all the letters that your Honor has

14    received.  He's helped me get clients.  He's helped

15    me guide clients.  He's been a source of

16    information, knowledge.  And, you know, it always is

17    -- to echo what both Jamie and Joe said, it's always

18    with a sense of what's right.  Jim has -- you know,

19    there was a judge, I think a judge your Honor is

20    familiar with, Judge John Reynolds in New Haven.  He

21    was a common pleas judge, was promoted, and John was

22    not a scholar, but he knew how to practice law.  He

23    had two rules:  One, represent your client; two,

24    watch out for the other lawyer.  That's what Jim

25    taught.  Jim taught all of us that, and we benefited
```

1    from that.  I think the letters you have show that.

2            The other contributions he's made -- you

3    know, we have a luxury here in Connecticut, I think.

4    This is a very collegial bar, it's a very collegial

5    district.  Jim didn't start that, but he propagated

6    that.  When Jim was the chief -- he was acting U.S.

7    attorney and then chief assistant United States

8    attorney, he set a tone of how we practice law in

9    this district, and it is one where we can be candid,

10   where we can be collegial, where we can battle

11   things out, but where we kind of know who each other

12   are and how we address the court, how we address

13   each other.  And his communications and his

14   interactions weren't limited to talking to somebody

15   in a black robe sitting on the bench, it was the

16   people who work in the courthouse, it was the court

17   officers, probation.  It was everybody, because

18   that's who he is.  He emanates this sense of

19   generosity, this sense of helping.  That's a

20   contribution he's made.

21           He's done that, and he consistently has

22   done that while dealing with the tragedies we all

23   know about that don't bear dwelling on here other

24   than to say that when you watch somebody deal with

25   personal tragedies and personal difficulties and not

1    have that turn to bitterness, and yet not just put

2    one step in front of the other so they get through

3    the day, but to help others get through the day,

4    that's something that merits recognition.  It merits

5    recognition from us as individuals when we interact

6    with other people.  I think it merits recognition

7    from us as we form communities and we live in our

8    communities.  And I submit, your Honor, it's

9    something that the Court is -- "obliged" I think is

10   probably too strong a word, but that merits

11   consideration by the Court when it considers what is

12   the appropriate resolution of the case -- in this

13   case, for example.

14            I want to talk to you now not as -- I

15   want to talk to you now not as a lawyer, and I don't

16   want this case to be defined -- as the government

17   properly points out, this is a case about a lawyer,

18   and the Court is going to have to sentence a lawyer,

19   and so that perhaps taints the framework or gives a

20   perspective on this case that perhaps might make it

21   uncomfortable should it influence the Court on how

22   things are perceived.  I want to talk about Jim

23   Pickerstein the person.

24            Before your Honor was sworn in and was

25   assigned to this court, there was a gentleman who

```
 1    had the snack bar in this courthouse, a guy named
 2    Lou Bomba, down here in the back, who had -- I think
 3    it was state subsidized.  He was legally blind.  Lou
 4    was there for years.  If he made a dollar a week of
 5    profit, that was a lot.  And Lou would kind of
 6    bumble through his day.  We were all -- as lawyers,
 7    we'd come in and we would chitchat with the Lou
 8    thinking that we were reaching out to the common man
 9    kind of thing.
10              Well, Lou got into trouble, and it
11    wasn't those of us who kind of went and chitchatted
12    with Lou who went and helped Lou out, it was Jim
13    Pickerstein.  Lou got into trouble because he got
14    into some reverse mortgage situation or something
15    like that, and it was Jim Pickerstein, not Jim
16    Pickerstein the lawyer, Jim Pickerstein the person,
17    who reached out to Lou Bomba, and he got him out of
18    that problem.  It goes without saying that there was
19    no fee involved or anything like that.
20              But that is the person that we're asking
21    -- that you are being asked to sentence.  That's the
22    person who has this generosity literally flowing
23    through his veins.  There are people who wake up in
24    the morning and think of others.  There are people,
25    like most of us, I'm afraid, and I'm ashamed to
```

1   admit, we think of ourselves and then maybe how

2   others fit into our plans.  Jim is an others person.

3   Jim is oriented to others.  He defines himself by

4   how he helps others.  And what you've heard, yes,

5   it's from lawyers, because he's helped lawyers, that

6   was the world in which he lived, but it was not

7   limited to lawyers, and I ask you not to look at

8   this case as a lawyer case.  This is a person case.

9   He's a person who made a mistake, and he admits it,

10  and no one suffers from it more than Jim.  Jim --

11  the loss to Jim of being handicapped in helping

12  others is severe.  Andy and I have talked to him

13  about it.  Andy and I were with him from the

14  beginning of this problem, and we feel it, and

15  hopefully we're adequately conveying it to your

16  Honor.

17            The importance of the qualities that Jim

18  has to all of us are what I mentioned.  It's when we

19  interact with other people and express to them our

20  appreciation for the way they treat us.  That binds

21  our community, that creates our community, and those

22  communities become part of our society.  That's how

23  we want to our society to be defined, to be disposed

24  to looking out for others and helping others.  When

25  they stumble, we help to pick them up.  When they

1    are in need, we try to help them out.  Some of us

2    come by it instinctively.  That's what Jim does.

3    Some of us have to work at it, but to the extent

4    that that's done -- I think, your Honor, when the

5    Congress said that your Honor is to take into

6    consideration the characteristics of the individual

7    in front of you, that's one of those

8    characteristics, I submit, that merits consideration

9    by your Honor.

10              The government has acknowledged, or

11   suggested, that a variance is appropriate.  It

12   disputes whether Jim should be entitled to a

13   guideline departure.  Frankly, it's the destination,

14   not the route of travel.  We're asking that Jim not

15   be incarcerated, that your Honor take into

16   consideration his personal situation, his illness

17   situation, the good works that he's done for others,

18   the good works he's done for members of the bar, the

19   good works he's done for the court, the difficulties

20   he is facing and the loss he's experienced, much of

21   it self-imposed, and that the complainant has

22   expressed his perception, or his view, as to what

23   the appropriate sentence is.

24              So I hope your Honor will take those

25   things into consideration.  This is a good and

1   decent man who, in his conduct in interacting with

2   us, and, more importantly, interacting with others

3   throughout the community, has displayed the type of

4   character that we aspire to.

5           Thank you.

6           THE COURT:  Thank you, Mr. Dow.

7           MR. BOWMAN:  May it please the Court,

8   44 years ago last month a very young 26-year-old

9   lawyer walked into the Bridgeport U.S. Attorney's

10   Office after serving two years in the Justice

11   Department's honors program where he was a trial

12   attorney trying drug cases across the country.  He

13   was coming home.

14           This young lawyer joined approximately

15   11 others, where we tried cases in the entire

16   district on a consistent basis, not at all like it

17   is today.  There was a camaraderie, a collegiality

18   among young lawyers, all of whom had talent and

19   respect for each other and for our system of

20   justice.

21           Jim rose quickly through the ranks and

22   became an acting U.S. attorney, and for a much

23   longer period the chief assistant U.S. attorney.  In

24   one of the letters your Honor has received he was

25   characterized as follows:  "As an office supervisor

1   Jim fosters an environment of integrity, hard work,

2   mutual support and family.  He was always there to

3   help when someone had a setback or a personal

4   difficulty, quietly with no fuss.  To be Jim's

5   friend was to know absolutely that he had your best

6   interests at heart."

7          You have testimony in these letters,

8   your Honor, of the contributions Jim made when what

9   seemed to be a run-of-the-mill drug case involving

10  college students turned into a murder case where two

11  witnesses were shot in the head and dumped in the

12  East River.  One survived, one died, and Jim stepped

13  in to coordinate with New York and the FBI, and over

14  the next 48 hours made a great contribution to the

15  investigation and prosecution and trial of the

16  responsible individuals who had kidnapped and shot

17  these two young witnesses and those who assisted

18  them.

19         That case included death threats to the

20  trial prosecutor and the presiding judge, and it was

21  Jim who sat with the mother of the victim in her

22  grief and who stayed in touch with her over the

23  years afterward.

24         In the context of that murder case it is

25  written.  "That case is representative of the things

most important to him, demonstrating his compassion

for victims, his integrity in his dealings with

defense counsel and their clients, and his

willingness to spend all the time necessary to see

that justice was done, far from the glare of

publicity and for no reward except for the knowledge

that he was doing the right thing."

        As Jamie Cowdery said in his letter, "As

always with Jim, the amplitude may have been a

little high, but the pitch was perfect:  Gracious, a

little self-effacing, and very encouraging."

        In another of the many letters, each of

which creates a picture from a slightly different

perspective, but always with the same theme, one

person wrote:  "Jim was a formidable adversary.  He

demonstrated the very best qualities of our

profession, litigating fairly and aggressively on

behalf of his client."  And then he describes his

personal relationship with Jim.  "He was always

relentless in the pursuit of what was fair in a

particular case.  Although lawyers are by their

nature competitive and our system requires lawyers

to be dedicated advocates to their clients' causes,

Jim recognized the power of the federal government.

Jim always made every effort to be fair, and I would

1    go so far as to say that as a prosecutor it was his

2    sense of justice that was the overriding principle

3    that Jim applied in his role as a federal

4    prosecutor, and instilled that value and dedication

5    in the men and women who worked with him during his

6    tenure in that office."

7              I saw Jim's dedication to justice not

8    only as a colleague, but for years afterward when I

9    was the federal defender and my assistants would be

10   in an adversarial relationship, as was I, with Jim

11   and his assistants in the U.S. Attorney's Office.

12             What you see in this courtroom and in

13   the letters people have written is an embrace by so

14   many people to whom he has given so much over the

15   years for his goodness, his guidance, and his sense

16   of compassion that have touched as many lives.

17             I was struck by the letter of an

18   administrative member of this court, not a judge and

19   not a lawyer, who is a keen observer of the justice

20   that was administered here and the conduct and

21   professionalism of Jim.  This person got to know Jim

22   from his work on the CJA list.  The list was not

23   very large then, and so they were calling the same

24   attorneys very frequently, and she said, "Jim

25   answered our call for the initial presentment and

1   most of the time took on the case.  I called him for

2   one case in particular, only to find that most of

3   the defendants had tuberculosis.  He had to be

4   tested, and he teased me about putting him in harm's

5   way, but stayed with the defendant even though he

6   had risk to his own health.  I use to think, 'wow,

7   if I ever needed a lawyer, I would like it to be

8   him.'"

9           You didn't have to be a lawyer or a

10  judge to know the quality of this man.

11          In April of '99 Jim's youngest son took

12  his own life as a result of heroin addiction.  Jim

13  never recovered and is haunted by his son's death to

14  this day.  For him, it was devastating, and no one

15  could shake his sense of guilt and responsibility.

16  He had done everything he could do, including

17  placing his son in a drug rehabilitation program out

18  of state which was highly recommended to him, and it

19  was at the sponsor's house that his son obtained the

20  gun and killed himself.

21          You have the psychiatric reports, and I

22  only wish we could have gotten Jim the help he

23  needed to deal with his son's death, but he never

24  had the help, and it's always because sometimes

25  those of us, as Eric Breslin said, that focus on

helping others overlook the most important person.

As a result, Jim vowed that he would do anything to ensure that this would never happen to any of his remaining children.  As a result, he incurred tremendous financial expense with the best of intentions that put him in what he perceived to be an insurmountable financial and emotional deficit which led ultimately to the commission of this offense.  He was never the same, assuming all of the burdens of his family and being careful not to let on the desperation and helplessness that he was feeling and experiencing in a very real way.  It was a wound that has never healed.

Four years later, in 2003, he was diagnosed with prostate cancer.  He was treated with a regimen of radioactive seeds, but in May of 2012 the disease returned.  Surgery is not an option, and he is now faced with what his doctors say must be aggressive monitoring and treatment, and that over time this disease will become metastatic and eventually lead to his death.  Although there is no timetable, as the government points out, right now for this 70-year-old man, as the doctor states in his report, ultimately it is likely he will succumb to this aggressive and progressive

1    castrate-resistant prostate cancer.

2              I say this to you because the

3    requirements of sentencing in this -- in our time

4    now, there must be support for the reasons that we

5    are asking the Court to vary its sentence from the

6    guidelines.  The Court has already heard the

7    considerations with respect to Jim's family

8    circumstances.

9              Finally, to put this in the context of

10   Section 3553(a) and policy statement 5K2.0 of the

11   sentencing guidelines, we submit there is ample

12   support for a non-confinement, below guidelines

13   sentence, whether by departure or variance, and

14   whether for a single factor or a combination of

15   factors not adequately taken into consideration by

16   the sentencing commission.  It cannot be said that

17   the sentencing commission was so omniscient and

18   could foresee so many different individual

19   defendants and their characteristics as to be able

20   to reduce a just decision to the intersection of an

21   X and Y axis.

22             It is only this Court who is in a

23   position to evaluate the history and characteristics

24   of Jim Pickerstein, balanced against the offense he

25   has committed, to be able to judge the impact of the

1  tragedies of this man's life and his continuing

2  medical and emotional challenges has had on his

3  judgment, and the challenges of those who depend

4  upon him, as well as the great goodness that

5  emanated from his soul, manifested by his

6  compassion, his sense of community, and his

7  generosity of spirit.

8          It is not an overstatement to say that

9  this man's decency has enriched and even saved

10  people's lives over a period of more than 40 years.

11  We have attempted to provide your Honor with all of

12  the information relevant and material to your

13  consideration of a just sentence in this case.  We

14  hope we have not failed in our presentation for

15  Jim's sake and for the sake of all of us, large and

16  small, professional and lay people, in all of us who

17  are here in support of this fine man, once proud and

18  noble, and now publicly shamed by his own conduct.

19  We ask the Court for a non-confinement sentence that

20  will be consistent with justice.

21          THE COURT:  Thank you.

22          Anything further from defense?

23          MR. BOWMAN:  No.  Mr. Pickerstein will

24  address the Court, but I would -- whatever your

25  Honor's pleasure.

```
1              THE COURT:  Why don't we have him

2     address me now.

3              THE DEFENDANT:  Thank you, your Honor.

4     Your Honor, I first want to make apology to those

5     people who I have hurt by my action.  Specifically

6     to Mr. Keefe's client and to others, I want to say

7     that I'm solely responsible for this offense.  I

8     want to express my gratitude, my deep, heartfelt

9     gratitude to the people who have supported me during

10    this process, and my sense of shame and sorrow at

11    putting everyone through this ordeal, especially my

12    family, and most especially my dear, dear wife of

13    almost 48 years.

14              To her, Marjorie, to my boys who are

15    here today -- I think my eldest son is sitting in

16    the back of the courtroom because he's wearing his

17    scrubs and he doesn't want to be seen, but that's my

18    son -- to all of those who have written to you and

19    are here today, I only hope you know I am truly

20    sorry for what I've done.  I'm sorry for what I've

21    done and I'm ashamed for what I've done, and to each

22    of you, I would like to express how sorry I am and

23    how grateful I am to each of you for the generosity

24    of spirit that you have shown toward me.  I don't

25    deserve it, but I appreciate it.
```

1          Thank you, your Honor.

2          THE COURT:  Thank you, sir.

3          Mr. Nardini.

4          MR. NARDINI:  Thank you, your Honor.

5  It's safe to say, this is a very sad day.  It's a

6  sad day for Mr. Pickerstein, as it is a sad day for

7  every defendant who comes before the Court for

8  sentencing, because it represents a point in their

9  life where there has been a break down, where

10 something they did is so wrong that it brings into

11 play the criminal justice system.

12          What I'd like to do is start really

13 where I'm going to end up so there is no surprises

14 here, which is that, as the government said in its

15 sentencing memorandum, we believe that the starting

16 point here should be the guidelines range, which is

17 33 to 41, but we recognize that there is a -- the

18 various factors that Mr. Bowman and Mr. Dow have

19 identified in their sentencing memo may justify a

20 variance from that.  But I'd like to say up front we

21 think it should be a modest variance and that it

22 would be unjust and unfair if the Court were to

23 impose a sentence that did not include at least some

24 component of incarceration.

25          So I'd just like to get that out there.

1 I'm not going to put a number on that; I think it's

2 the Court's job, and it's a difficult job, and it's

3 one I certainly don't envy the Court, because here,

4 in Mr. Pickerstein's case, there are a number of

5 competing considerations on both sides of the

6 ledger.  I think that Mr. Bowman and the various

7 people who have spoken for Mr. Pickerstein have done

8 an eloquent job of pointing out many of the things

9 relating to the nature and characteristics of the

10 defendant that do matter and that the Court very

11 much appropriately should take into consideration

12 when determining the penalty here.

13   But what I'd like to do here is talk

14 about the offense, because the reason why we've all

15 come together here is not a birthday party, it's not

16 a retirement dinner.  We're here together today

17 because Mr. Pickerstein committed a crime, and I

18 think we need to talk about that crime because that

19 is why your Honor is here, to consider what is the

20 proper penalty.

21   And it bears repeating what happened

22 here.  He stole more than half a million dollars.

23 He stole $600,000.  Because all of us who work in

24 the federal courts generally work in cases involving

25 big dollar amounts, I think that we sometimes become

1    inured to just how big those dollar amounts are.

2    Because we have high prosecution thresholds, you are

3    not dealing in cases in federal court where people

4    steal 1,000, 2,000 dollars.  We're dealing in the

5    hundreds of thousands, the millions, and I think

6    sometimes we become jaded and forget just how much

7    money that is and how the public will perceive that

8    to be an enormous amount of money.

9         And to give a sense of perspective, the

10   figure I'd like to use when I'm talking, whether

11   it's sentencing or otherwise, is what the median

12   household income is in this country.  It's under

13   $54,000 a year.  Mr. Pickerstein stole more than 11

14   times the median household income in this country.

15   And I think that that gives us a sense of scale when

16   we're thinking about this, to think that we're not

17   talking about a small amount.

18        We're also -- there were a couple of

19   references made, as generally are naturally made,

20   about this mistake that Mr. Pickerstein made.  This

21   was not a mistake.  A mistake is something you do by

22   accident, a mistake is on oversight, a mistake is an

23   aberration, a mistake is an accident.  I think Mr.

24   Pickerstein has fully accepted responsibility for

25   the fact that this is not a mistake.  This was a

1    crime, and it was one that he committed over more

2    than two years.

3            What he did was he had a trust fund as a

4    lawyer that he was holding with sole signatory

5    authority for one of his clients who was in prison,

6    who couldn't look out for that money, who needed

7    somebody to be trusted on the outside to take care

8    of it, and that was Mr. Pickerstein.  So not only

9    was he in the normal position of trust that a lawyer

10   and client are in, but he was the sole signatory

11   authority of this.  This wasn't the IOLTA account

12   for the firm.  In over at least 42 occasions he

13   dipped into that bank account like it was his

14   piggybank.  Over and over, nearly every month,

15   sometimes more than twice a month, he would write a

16   check against that.  Sometimes it was made out to

17   H.J. Pickerstein; it went into his bank account.

18   About 50-some percent of it went to pay his taxes,

19   which in some senses we think of as laudable or less

20   culpable in the sense he wasn't spending it on

21   gambling or, you know, wine, women and song, but he

22   was spending it on himself for his own tax

23   liabilities and for his living expenses.

24           And, again, you have to think of this

25   from the standpoint of most citizens.

1   Unfortunately, there are a lot of people in the
2   world who live in debt.  There are a lot of people
3   out there who run up against hard financial times.
4   There are people who run out of money.  There are
5   people who do this for the most legitimate reasons,
6   not because they're living it up, but just because
7   they run into financial problems.  They don't steal
8   as a reaction.  What you do is you negotiate with
9   your creditors.  You talk to the IRS and you say, I
10  don't have the money, can I go into a payment plan.
11  And the worst case scenario is we have the
12  bankruptcy code.  You come into court.  It requires
13  a certain amount of public humiliation and shame to
14  admit you have not been able to live up to your
15  debts, but that is what we do.  We don't steal half
16  a million dollars from someone else.  Most people
17  don't.
18          And that's why we're here today, because
19  his reaction to these stresses and to this
20  convergence of terrible circumstances in his life
21  that led him to be in a horrible financial
22  situation, his reaction was to steal.  And it really
23  is striking because it seems out of character for
24  him, and I think that is a consistent message from
25  all of the people who have spoken today, that

1   throughout much of his life he did live to be

2   helpful to other people, and there are countless

3   instances, which I think are heartfelt and sincere,

4   where he truly was generous to other people.

5           The problem, and what brings us here

6   today, is that for over two years he was not

7   generous to the victim of his crime.  He pilfered

8   his bank account for more than half a million

9   dollars from a position of trust, and he did it

10  repeatedly.  He did it until the litigation ended;

11  he had to transfer this money over and wire it to

12  the victim after the litigation was over.  And

13  almost immediately, that same month, when all of the

14  wires went out, the victim contacted him and said:

15  Wait a minute, there's a whole chunk of money

16  missing.  There is about $700,000 missing.  Where is

17  my money?

18          And Mr. Pickerstein did not tell where

19  it went.  He said, oh, it went to pay legal bills,

20  and he gave him a whole story, which was a lie and

21  which he has admitted is a lie.  He sent an e-mail

22  and then he sent him a formal letter on his legal

23  letterhead, parcelling out this false story.  And it

24  was only after the victim got out of jail and

25  confronted Mr. Pickerstein that he admitted the

1    truth.  And, in fact, he admitted the truth,

2    unbeknownst to him, in a taped conversation, that

3    the victim at that point had lost all trust of the

4    defendant and had taped it and then brought that

5    tape to the attention of the law firm where Mr.

6    Pickerstein was exposed for having committed this

7    crime.

8         So I think it is important as the Court

9    thinks about all of these laudable characteristics

10   that have been brought out by Mr. Pickerstein, and I

11   that agree, again, are relevant, that just as much

12   the Court has to think about the offense, because

13   that's why we are here today, we have to talk about

14   the length of time, meaning two years and over 42

15   instances where he stole the money, the substantial

16   amount of $600,000, the betrayal of trust, and we

17   have to then talk about 3553(a), and I just want to

18   touch on a couple of them.

19        Specific deterrence is not an issue

20   here.  This was clearly a crime of opportunity.  Mr.

21   Pickerstein committed this crime because he was not

22   being watched.  There were so many instances that

23   matter here for the Court that describe how Mr.

24   Pickerstein did good things for people and took no

25   credit, he did things when he wasn't being watched.

1   This, unfortunately, is on the other side of the

2   ledger.  He stole this money while he was not being

3   watched.  Precisely because he wasn't being watched,

4   that's why he got away with it for two years and

5   then nearly a year after the victim got out of

6   prison.

7           So this was a crime of opportunity that

8   is inconceivable that it could recur, and,

9   therefore, I think there is no reason for this Court

10  to give any weight to specific deterrence when it

11  comes time to choose a sentence.

12          But general deterrence is a different

13  matter.  Every day in this court the judges see a

14  parade of people in positions of trust who have

15  stolen money from people in whose interests they're

16  supposed to be acting.  We see financial advisors,

17  bookkeepers and trusted employees, and,

18  unfortunately, we see all too often lawyers.  The

19  lawyers tend to follow a certain pattern.  They tend

20  to be having problems with their legal practice,

21  they can't meet the bills, and conveniently enough

22  there is a trust fund that they're supposed to be

23  managing for someone's benefit.  And the thefts tend

24  to occur when they steal from the funds of someone

25  who can't look out for their own interests.  It

1    could be an elderly victim who is incapable of

2    monitoring their funds, it could be a probate estate

3    where the person has died and no one really knows

4    what's in there, or, in this case, it could be a

5    client who is in prison and who doesn't have access

6    to the records, can't monitor things, and has

7    entrusted someone else.

8              So it's important that whatever sentence

9    this Court imposes achieve the goal of general

10   deterrence so that other lawyers who are out there

11   see that they cannot think about raiding their

12   clients' funds without receiving a consequence that

13   is meaningful.

14             The last two concepts that I think are

15   worth focussing on here are the need to promote

16   respect for the law and the need to avoid

17   unwarranted sentencing disparities.  And they really

18   come back to that same fundamental point, that the

19   Court here, and in other seats in Connecticut,

20   unfortunately sees a parade of people who have

21   committed crimes like this all of the time.  Mr.

22   Pickerstein, many things about him, as his speakers

23   have demonstrated, are different, are exceptional

24   and warrant consideration by the Court.  But the

25   circumstances that drove him to commit this crime,

1    being hard-pressed financially, are all too common.

2    The way in which he committed this crime is all too

3    common, and it is important that those commonalities

4    at least be viewed and weighed similarly in

5    different cases.

6            This Court is going to have another

7    defendant in two, three, four months, however long

8    it is before a case comes off the wheel, and it will

9    be another lawyer who has embezzled from someone's

10   estate and lied about it.  The circumstances will be

11   different, the sentence inevitably will be

12   different, for what reasons I don't know.  There may

13   be factors that are more sympathetic about those

14   defendants, there may be factors that are less so,

15   and I'm not saying that any of those people are

16   identical to Mr. Pickerstein, I just don't know, but

17   the common core of the offense is fairly and sadly

18   typical, and that, I think, needs substantial

19   weight.

20           Whatever sentence this Court imposes,

21   the Court is going to have the difficult task of

22   balancing all of these factors and ensuring that

23   it's promoting respect for the law in two ways:  One

24   of ensuring that Mr. Pickerstein -- anybody who is

25   here today understands that the sentence has been

```
 1   fashioned in light of Mr. Pickerstein's personal

 2   circumstances and is appropriately taking care of

 3   all of the things that make his case different, but

 4   the public and everyone here also needs to know that

 5   the things that make his case the same also got

 6   weight and that there is no special, more lenient

 7   brand of justice for legal insiders.

 8            Thank you.

 9            THE COURT:  Thank you very much.

10            Anything further, Mr. Bowman?

11            MR. BOWMAN:  Yes, your Honor.

12            THE COURT:  Okay.

13            MR. BOWMAN:  A deficit, the economic

14   deficit, your Honor, arose before his tax

15   liabilities.  It was a direct result of the vow that

16   he had taken that he could never allow what happened

17   to his youngest son happen to his two remaining

18   sons.  It was a result of that overspending, it was

19   a result of that commitment, which was unrealistic

20   financially, that caused him to get into problems

21   with the Internal Revenue Service.  So it wasn't

22   just that all of a sudden he had this tax liability

23   arise, it started years before.

24            Secondly, general deterrent

25   considerations, they're tricky because there is this
```

1    idea that the anonymous public, those people who we

2    don't see and who are not here in the courtroom and

3    who may only learn about a case from the newspaper

4    or the radio or television, those people with less

5    control, less understanding and appreciation of the

6    facts of the case, are the people that we are most

7    concerned about impressing in a general deterrent

8    context.

9          Yes, this is a -- not a random community

10   here, but it's a large community here in this

11   courtroom today, and there are people who know this

12   man, and I know your Honor has heard them and has

13   appreciated what they have had to say.

14         I do want to address the legal insider

15   argument.  I don't think the argument is worthy of

16   this courtroom.  Do we punish those of us who have

17   given our lives, dedicated the best parts of

18   ourselves in service of this court, our sense of

19   justice, and, therefore, we're afraid that if we

20   give credit to someone who is truly deserving that

21   we will be seen as giving a break to an insider?

22   It's a very cynical argument and I urge the Court to

23   reject it.

24         The only reason Jim Pickerstein has been

25   a lawyer in this court for more than 40 years is

```
1    because the quality -- it is because of the quality

2    of his integrity and the quality of his advocacy and

3    his dedication.

4              I hope your Honor will seriously take

5    into consideration the other matters that we have

6    presented.  It would not be a disservice to justice

7    if this man, with all of his challenges, with all of

8    the background you have heard today, were not sent

9    to prison.

10             Thank you.

11             THE COURT:  Thank you, Mr. Bowman.

12             Anything further, Mr. Nardini?

13             MR. NARDINI:  No, your Honor.

14             THE COURT:  Okay.  All right, I've heard

15   the arguments of both sides.  I appreciate the

16   advocacy from both sides; it's been helpful to the

17   Court.  I'm going to take a brief recess and then

18   come back and impose sentence.

19             (Recess)

20             THE COURT:  Please be seated.

21             We are now ready to turn to the

22   imposition of a sentence.

23             Mr. Pickerstein, I'm required to

24   consider quite a number of factors before deciding

25   on a sentence in your case.  These factors -- you
```

1   can be seated.  These factors are set forth in a

2   statute called 18 U.S.C. Section 3553, and include:

3   Your background and characteristics; the nature and

4   circumstances of this crime; the various purposes of

5   a criminal sentence, which are punishment,

6   deterrence, rehabilitation, and incapacitation; the

7   sentencing guidelines and the advice they give me

8   about how to sentence you; the need to avoid

9   unwarranted sentencing disparities among defendants

10  with similar records who have been found guilty of

11  similar conduct; the need to provide restitution to

12  any victims of the offense, and a variety of things.

13          In short, I have to consider everything

14  I know about you, good or bad, and weigh that

15  information to determine a sentence that is fair,

16  just and reasonable in your individual case, and

17  that is sufficient but not greater than necessary to

18  serve the purposes of sentencing.  So, Mr.

19  Pickerstein, while I have taken into account all of

20  these factors, I would like to explain more

21  particularly how I've reached a decision as to the

22  appropriate sentence in your case.

23          I recognize that I have the discretion

24  to depart from the range provided by the sentencing

25  guidelines on the basis of circumstances not already

1   factored into the guidelines or to impose a sentence

2   outside the guideline scheme.  I do choose to impose

3   a non-guideline sentence, and do so for the

4   following reasons.  First, looking at your

5   background and characteristics, there is no question

6   that you have lived an impressive professional life

7   before this criminal conduct, having risen to the

8   top of your profession in the state of Connecticut,

9   both in the U.S. Attorney's Office and in practicing

10   at prominent law firms.  From the various

11   submissions written on your behalf, there is no

12   question that you have been, and even after your

13   admission of guilt continue to be, revered by many

14   in the state.

15        You also have shown yourself to be

16   incredibly generous.  Time and time again you have

17   been there when others needed it, not just your

18   family, but friends and those in need, including

19   former clients.  You have helped make better the

20   lives of others around you, and you have done so not

21   in large and showy ways, but in those small but

22   significant ways that transform lives.  You have

23   visited the sick, stood by those who mourn, and

24   provided support in any way you possibly could to

25   those in need.  Just as importantly, it appears that

1    time and time again you were there for others and

2    expected nothing in return.

3            Your good acts and otherwise outstanding

4    character, though, must be considered along with the

5    nature and circumstances of the crime you committed

6    here.  You violated one of the cardinal rules of the

7    practice of law, treating funds entrusted to you as

8    a lawyer as your own money.  This crime occurred

9    over the course of more than two years, from

10   August 2011 to October 2013, when you took out

11   nearly $600,000 from a single client's fund and

12   transferred them to a personal bank account.  This

13   happened over a period of time, but also on more

14   than 40 separate instances.

15           Even more troubling, it appears that you

16   did not have an intention to pay the funds back.

17   Indeed, the mail and wire fraud that brings us here

18   suggests a desire to sort of cover up the fact by

19   writing your client and ensuring that the funds he

20   suspected were missing actually were paid out to the

21   law firm.  It was not until later when the client

22   confronted you did you begin to confess the crime at

23   hand.  I say "begin" because before admitting it you

24   tried to bargain with the client hoping your theft

25   would never become known to your law partners, much

1   less to anyone else.

2           So in terms of this particular crime,

3   there is the victim, the client; there is also the

4   law firm that was affected; and now the insurance

5   company which has reimbursed the majority of funds

6   to the law firm.  But while the Court has not heard

7   from either the Travelers Insurance Company or from

8   McElroy Deutsch, the Court has received

9   correspondence from the client indicating that he

10  has no personal animosity towards you and does not

11  wish you sent to prison.

12          This brings us to the various purposes

13  of a criminal sentence, punishment, deterrence,

14  rehabilitation, and incapacitation.  There is no

15  question that there should be punishment,

16  particularly for those who know the law far better

17  than most.  The issue is not whether there should be

18  punishment, of course there should.  If anything, we

19  are a nation of laws.  The law must apply to

20  everyone, and everyone must be held accountable for

21  violating the law.  The question, rather, is what

22  should the punishment be and how much should that

23  punishment be.

24          Given what you've been through, what

25  your family has been through, there is no question

1   that there is very little, if any, need for specific

2   deterrence.  Although you should have gotten it

3   before you wrote just one of those 40 or so checks

4   you wrote from a client's account, I have little

5   doubt, you get it now.

6         You also have shown yourself to be

7   someone who not only understood the difference

8   between right and wrong, but helped others

9   understand that difference as well.  Now here you

10  are the teacher relying on the students, many

11  students who you have taught.  It must be more than

12  humbling, it must be somewhat humiliating, not just

13  to see the diminishment in their eyes, but to be

14  diminished in the eyes of the law.

15        But if I understand the submissions,

16  various submissions on your behalf, and your own

17  words, I am convinced, as I said, you get it.  You

18  committed a grave wrong and have no intention of

19  ever committing such a wrong again.  Therefore, as I

20  noted, there is little need, if any, for specific

21  deterrence.

22        General deterrence, however, is another

23  matter.  The temptation to take from others who

24  seemingly have more than they need, while you and

25  others you love need so much, is an age-old problem,

1   and there is no suggestion that this problem will

2   end with you.  As a result, there is a need for

3   general deterrence.  The law requires, and I think

4   rightly so, that there be punishment to send this

5   message.  The filings on your behalf have made me

6   well aware of the challenging circumstances you have

7   found yourself over the last several years.  I,

8   frankly, cannot imagine what it would be like to

9   deal with the loss of a son the way you had to deal

10  with or the other challenges with your children or

11  other family matters that have brought considerable

12  financial pressure on you.

13          But we cannot deal with it by resorting

14  to crime or, even more troubling, deal with it by

15  dissembling about our crime, trying to cover up

16  deception by more deception.  But, of course, the

17  need for punishment must be balanced out by the need

18  for rehabilitation.  Is there really a need to

19  incarcerate you in order to rehabilitate you?  Other

20  than to send a message of punishment, what is the

21  rehabilitative purpose behind incarceration in your

22  case?  Other than to incarcerate as part of general

23  deterrence, I have not been able to identify one.  I

24  also do not see a need to incapacitate you in terms

25  of keeping you from society.  You no longer -- you

don't pose a threat; your financial crimes and

deceptions that went with it have been exposed and

dealt with in the context of this proceeding.

          Now, as you know, I must consider the

sentencing guidelines and the advice they give me

about your sentence.  A total offense level of 20,

with a criminal history category I, results in a

range of 33 to 41 months, a fine range of 7,500 to

75,000, and a supervised release term of one year to

three years.  Of course, as the Court recognized in

U.S. v. *Booker*, the federal sentencing guidelines

are to be treated as advisory rather than mandatory.

I do have to consider the guidelines, and I have

considered them.

          In particular, I have also considered

the need to avoid unwarranted sentencing disparities

among defendants with similar records who have been

found guilty of similar conduct.  As U.S. Attorney

Nardini pointed out, some of the statistics

regarding other similar conduct, the data also

indicates a significant number of the sentences for

fraud were below guideline sentences, and that those

sentences on average were half of the length of the

guidelines minimum.  The data would suggest that a

significant number of judges feel that sentences

 1   less than the guidelines range are sufficient to

 2   provide just punishment.

 3             In this case, even more importantly,

 4   there is agreement by both the government as well as

 5   the defense that given all of the factors in this

 6   case with you, this particular defendant, that

 7   something less than the guideline range is

 8   appropriate.  And as I indicated earlier, the Court

 9   agrees that a non-guideline sentence should be

10   imposed.  Indeed, both sides agree that your serious

11   health condition that certainly requires ongoing

12   treatment should be a factor in reducing the

13   sentence below the guideline.  As I understand the

14   submission from one of your doctors, it states that

15   you will now be faced with an aggressive treatment

16   regimen and over time it is expected that your

17   prostate cancer will spread.

18             Both sides also agree that you have an

19   essential role with regard to family members who

20   have encountered serious challenges in their life.

21   In particular, the Court is aware of and concerned

22   about the impact any lengthy incarceration may have

23   on the family and believes such considerations

24   warrant adjusting considerations of imprisonment

25   accordingly.

1           There, of course, is no question that

2     restitution is warranted to address the remaining

3     economic impact to Mr. Pickerstein's former client

4     and former law firm, as well as the insurance

5     company that insured the law firm.

6           Also, I will say any sentence imposed by

7     me must be tempered by the knowledge that, at

8     bottom, what I have before me is a good person.  I

9     should correct that, an exceptional person.  I

10    cannot help not being impressed by the countless

11    unseen efforts you have taken on behalf of others

12    and in service to your community, including your

13    synagogue.  But it also seems you have neglected

14    yourself.  To put it more plainly, you may not have

15    loved yourself as much as you should, and certainly

16    not as much as all of the people around you clearly

17    do.  One of the most profound, but perhaps

18    underappreciated sentiments expressed by the

19    Reverend Dr. Martin Luther King, Jr., is that while

20    love of others is very important, before you can

21    love other people adequately, you have to love your

22    own self properly.  He goes on to say, "Many people

23    have been plunged into the abyss of emotional

24    fatalism because they didn't love themselves

25    properly."

1          So as I prepare to render your sentence,

2    regardless of what it is, I urge you to love

3    yourself, sir.  You have been loving to others, but

4    now is the time for you to love yourself, truly love

5    yourself.  You can begin by fully appreciating the

6    difference you've already made in this world and use

7    that knowledge to propel yourself to continue making

8    a difference in this world.

9          You also can love yourself by letting

10   all of those people whose lives you have touched

11   throughout the years show their support for you in

12   this time of need, just as you've shown support for

13   them in their time of need.  They cared about you

14   when you were in your dire place of need, but

15   perhaps you felt trapped and could not reach out to

16   them.  They care about you now, and I have no reason

17   to believe that they will not always care about you.

18   So let them care about you, let them show their love

19   for you, but if you need it and it does not seem to

20   be there, although I have no doubt that it is, ask

21   for it and it will be there.  With that love, a

22   greater love for yourself and a willingness to let

23   those who love you show you that they love you

24   unabashedly, you'll make it through the darkest of

25   the days and live the rest of your days even more

1  fully than you have the days before it, and you will

2  contribute even more to this world than you have

3  contributed to this world when you were a lawyer.

4  You see, this nation, this state, does not lack for

5  lawyers.  It does lack for people who, like you,

6  have the capacity to touch the lives of people the

7  way you have and the way you still can.

8          So with all of that, and with all of the

9  concerns that I've focussed and expressed on, I am

10  now ready to pronounce your sentence.  I would ask

11  you to please stand, sir.

12          For the reasons I've explained, Mr.

13  Pickerstein, I hereby sentence you to a 30-day term

14  of imprisonment.  To the extent that your medical

15  condition requires it, the Court will recommend to

16  the Bureau of Prisons that you serve your sentence

17  at a medical facility.  Otherwise, you should serve

18  your sentence as a minimum-security facility

19  sufficiently close to your family, taking into

20  consideration any security concerns warranted by

21  your previous employment.

22          After imprisonment, you shall be placed

23  on a supervised release period for three years.  The

24  first six months of that term shall be on home

25  detention with location monitoring.  You shall

1   comply with all of the program requirements and

2   instructions provided.  While in home detention, you

3   shall be restricted to your residence at all times

4   except for the following:  Education, employment,

5   religious services, medical or mental health

6   treatment, care or appointments or treatment related

7   to the grandchild who currently lives with you,

8   appointments with counsel, court appearances,

9   appointments with the U.S. Probation Office,

10  appointments at the direction of the U.S. Probation

11  Office, court-ordered obligations, and other

12  activities as are approved by the probation office.

13  The defendant is to pay all or a portion of the cost

14  of the program based on your ability to pay as

15  determined by the probation office and approved by

16  the Court.

17          As conditions of supervised release, I

18  order the following:  The following mandatory

19  condition of supervised release in Guideline Section

20  5D1.3(a), that the defendant shall not commit

21  another federal, state or local offense; that the

22  defendant shall not unlawfully possess a controlled

23  substance; that the defendant shall make restitution

24  in accordance with 18 U.S.C. Sections 2248, 2259,

25  2264, 2327, 3663, 3663A and 3664; and pay the

1   assessment imposed in accordance with 18 U.S.C.

2   Section 3013.

3         The defendant shall cooperate in the

4   collection of a DNA sample from the defendant at the

5   direction of the United States Probation Office if

6   the collection of such sample is authorized, and the

7   standard conditions of release set forth in the

8   policy statement at Guideline 5D1.3(c).

9         And as further conditions of supervised

10  release, I order that the defendant shall

11  participate in a program recommended by the

12  probation office for mental health treatment.  The

13  defendant shall pay all or a portion of the costs

14  associated with the treatment based on the

15  defendant's ability to pay as recommended by the

16  probation office and approved by the Court.  You

17  shall make available to the probation office any

18  requested financial information, and you shall pay

19  any restitution that is imposed by this judgment.

20  You shall pay what remains unpaid at the

21  commencement of the term of supervised release at a

22  rate of no less than $500 per month.  This schedule

23  pay be adjusted based on the defendant's ability to

24  pay as determined by the probation officer and

25  approved by the Court.

```
 1              If you violate any of these conditions

 2    during your supervised release, the Court will be

 3    free to sentence you to additional time in prison of

 4    up to two years.  So the consequences of a failure

 5    to behave properly during supervised release are

 6    extremely serious.  The Court would not hesitate to

 7    sentence you to additional time in prison if you

 8    violate the terms of supervised release.

 9              Do you understand, sir?

10              THE DEFENDANT:  Yes, I do, your Honor.

11              THE COURT:  All right.  And under 18

12    U.S.C. 3143(a), the Court may approve an application

13    for voluntary surrender.  Based on what I've

14    reviewed, there does not appear to be any reason

15    that Mr. Pickerstein should not be able to surrender

16    voluntarily on a date to be determined in the near

17    future.

18              What's the position of the government,

19    Mr. Nardini?

20              MR. NARDINI:  No objection.

21              THE COURT:  All right.  Mr. Bowman, do

22    you have a position on date, or do you want to get

23    back to the Court on a date?

24              MR. BOWMAN:  Your Honor, I think if we

25    could have 45 days.
```

```
 1                    THE COURT:  That's fine.

 2                    MR. BOWMAN:  And if I could ask the

 3    Court for a recommendation.  Since the sentence is

 4    30 days, I'm concerned about where the Bureau of

 5    Prisons may place him.  So if you could recommend

 6    the federal prison camp at Otisville.  I have had a

 7    client who was there who had -- recently had

 8    angioplasty there for a condition, so they have

 9    access to medical facilities there, and I believe he

10    would be safe there.

11                    THE COURT:  All right.

12                    MR. DOW:  If your Honor could just state

13    those reasons, I think that influences the BOP when

14    they make a designation.

15                    THE COURT:  Yes.  I'm happy to in the

16    statement of reasons recommend that he be placed in

17    Otisville, the Otisville, New York facility.

18                    PROBATION OFFICER WACKERMAN:  Excuse me,

19    your Honor.  I'm sorry, I may not have heard this,

20    did you waive the drug testing?

21                    THE COURT:  I didn't, but I intended to.

22    Yes, I do waive the drug testing.

23                    All right.  Oh, also with respect to a

24    fine, I'm not ordering you to pay a fine or the

25    costs of imprisonment because your financial status,
```

1   as I understand, is such that you are unable to pay

2   the fine or costs, and it is not likely you will

3   become able to pay them.  As well, the imposition of

4   a fine may very well impair your ability to pay

5   restitution to victims of your offense.

6           You shall pay the mandatory special

7   assessment of $100.

8           Do either counsel know of any reason the

9   sentence I described cannot legally be imposed by

10  the Court?

11          Mr. Nardini?

12          MR. NARDINI:  No, your Honor.

13          THE COURT:  Mr. Bowman?

14          MR. BOWMAN:  No, your Honor.

15          MR. NARDINI:  Your Honor, are you

16  getting to restitution?

17          THE COURT:  Yes.  I referenced -- I did

18  reference restitution, but yes, there is an order of

19  restitution in the amount -- actually I had stated

20  it earlier.  It's 600.  I did put the amount on the

21  record.  There it is.  Yes, there is an order of

22  restitution in the amount of $633,410.04.

23          MR. NARDINI:  Thank you, your Honor.

24  And with the Court's permission, I can prepare a

25  restitution order, a draft one, and submit it to the

1    parties for the Court's consideration.

2              MR. BOWMAN:  There is no objection.

3              THE COURT:  Yes, that would be fine.

4              All right, Mr. Pickerstein, the sentence

5    I set forth is hereby imposed as the sentence in

6    your case.  The judgment of the Court will be

7    prepared for my signature by the clerk's office in

8    consultation with the United States Probation

9    Office.

10             Mr. Pickerstein, you have the right to

11   appeal the sentence that I've just imposed.  If you

12   wish to appeal, you must file a written notice of

13   appeal within 14 days of the entry of this judgment.

14             Do you understand the time limit for

15   filing a notice of appeal, sir?

16             THE DEFENDANT:  Yes, I do, your Honor.

17             THE COURT:  If you wish to appeal, but

18   cannot afford to do so, you may apply for leave to

19   appeal in forma pauperis.  If that motion is

20   granted, the court will waive the filing fee for

21   your appeal and appoint a lawyer to represent you at

22   no cost to you.  Do you understand, sir?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Anything further, Mr.

25   Nardini?

 1              MR. NARDINI:  No, your Honor.

 2              THE COURT:  Mr. Bowman?

 3              MR. BOWMAN:  No.

 4              THE COURT:  All right, we are adjourned.

 5              (Proceeding concluded 4:35)

1

2        I certify that the foregoing is a correct

3  transcript from the record of proceedings in the

4  above-entitled matter.

5

6                      6/9/16

7                      Date

8

9               /S/   Sharon Montini

10              Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25